**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Hector Morales CERVANTES, aka Benito C. Carillo, Defendant–Appellant.**

**No. 98–50722.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1999

Filed June 12, 2000

Michael Ian Garey, Santa Ana, California, for the defendant-appellant.

Carmen R. Luege, Assistant United States Attorney, Santa Ana, California, for the plaintiff-appellee.

Before: BROWNING and TASHIMA, Circuit Judges, and JONES,* District Judge.

TASHIMA, Circuit Judge:

Hector Morales Cervantes appeals from his conviction for manufacturing and possessing with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). He contends that the district court erred by admitting into evidence items seized pursuant to an invalid search warrant and by denying his motions for acquittal and a new trial. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. FACTUAL BACKGROUND

On January 7, 1998, Police Officer John Yergler responded to a call to contact firefighters at an apartment building in Garden Grove, California. Upon Officer Yergler's arrival at the scene, a firefighter told him that a tenant in Apartment 6 had complained of a strong chemical odor. The firefighter said that the fire department had called the police because it be-

---

* The Honorable Robert E. Jones, United States District Judge for the District of Oregon, sitting by designation.

lieved there might be a drug lab operating in the building.

As Officer Yergler approached Apartment 6, he smelled a strong chemical odor from approximately 20 feet away. Although he could not identify the chemical, Officer Yergler testified that the odor was similar to a strong solvent, cleaning agent, or an acetone-based chemical. He also believed the odor was consistent with methamphetamine production, which he had been trained to recognize. From his police training, Officer Yergler also knew that chemicals used in methamphetamine labs are explosive.

Officer Yergler then went to Apartment 3, which is directly below Apartment 6, because the chemical odor seemed stronger outside of Apartment 3 than any other apartment. Looking through a space below the blinds of a living room window, he saw two men sitting on a couch. The couch was the only item of furniture in the room. Officer Yergler also looked under the kitchen window blinds and saw a man standing by the kitchen counter and a large pot on the floor. He then looked through a bedroom window and noticed that there was no furniture in that room.

Officer Yergler returned to Apartment 6 and entered it with the permission of the tenant. The tenant had left the apartment with her infant child because she was afraid of harm from the fumes. Unable to find the odor's origin within Apartment 6, Officer Yergler determined that the odor was coming from Apartment 3 because that was where the odor was the strongest. Officer Yergler called for backup and waited until Officer Wasinger arrived.

Concerned about the chemical odor, and fearing that many of the apartment building's tenants would be injured if an explosion occurred, Officer Yergler decided to make contact with the men in Apartment 3. He pounded on the front door and identified himself as a police officer. Getting no response, he looked under the window blinds and saw that the three men had not moved; they remained seated in the living room. Officer Yergler pounded on the door a second time and identified himself. This time, Cervantes came to the window and looked out. Officer Yergler shined his flashlight on himself to show that he was a police officer and ordered Cervantes to "come to the door."[1]

When Cervantes opened the door, the chemical odor coming from the apartment smelled much stronger to Officer Yergler. Officer Yergler told Cervantes in English that he was investigating the odor coming from the apartment and asked Cervantes if he was aware of the odor. Cervantes did not respond. Instead, he stepped outside and attempted to shut the door behind him, but Officer Yergler pushed the door open. Officer Yergler asked Cervantes in English if he lived in the apartment, but received no response. He then asked the same question in Spanish of all three men; all three responded no.[2] Officer Yergler asked Cervantes if he could enter to determine the odor's cause, but Cervantes did not respond.[3]

Officer Yergler, still concerned about the noxious fumes, entered Apartment 3 with Officer Wasinger following behind him. Once the police officers entered, all three suspects ran from the apartment. Officer Yergler chased Cervantes while Officer Wasinger chased the other two suspects.

Officer Yergler apprehended Cervantes in front of the apartment building and then reentered Apartment 3 to search for an unattended drug lab or other suspects.

1. The record does not disclose what Officer Wasinger was doing during this time.

2. The record reflects that Cervantes and one of the other men only speak Spanish. The record does not indicate whether the third man speaks English because he has not been apprehended.

3. It is unclear from the record whether Officer Yergler asked this question in English or Spanish.

On the kitchen counter and in a large pot on the kitchen floor, he found a substance he believed to be methamphetamine. He then secured the premises, opened windows to air-out the apartment, and contacted the Garden Grove Police Department's Special Investigations Unit (SIU). While waiting for an investigator to arrive, he asked the apartment manager and assistant manager to help evacuate the tenants from the building and to turn off any open flames.

When Investigator Michael Reynolds of the SIU arrived, he searched the apartment, including the kitchen containing the suspected drugs. Investigator Reynolds then applied for a search warrant, which was granted a few hours later. Upon further searching the apartment, the officers seized 30 pounds of methamphetamine in its final stages of production, cutting agents, a hydraulic press, iodine, Coleman fuel, and other items that could be used to make methamphetamine.

Upon questioning the apartment manager, the police learned that Rufino Vergara, not Cervantes, was the leaseholder of Apartment 3. Neither the manager nor the assistant manager had seen Vergara since he signed the lease in March, 1997. The manager testified at trial, however, that Cervantes had paid the rent to her in person three or four times since the lease commenced. The assistant manager testified that Cervantes told her on at least one occasion that he was Vergara.

Cervantes was convicted by a jury of possessing with intent to distribute and manufacturing methamphetamine. On appeal, Cervantes contends that the district court erred in denying his motion to suppress evidence seized pursuant to the warrant. He also contends that the district court erred in denying his motions for judgment of acquittal and a new trial, in

which he argued that: (1) there was insufficient evidence to support his convictions; (2) the government misstated the law during its summation; and (3) the district court erred in admitting another tenant's testimony.

## II. DISCUSSION

### A. Motion to Suppress Evidence

Cervantes argues that the government improperly included information obtained from illegal, warrantless searches in the affidavit filed in support of the search warrant application. Without the illegally obtained evidence, Cervantes contends, the affidavit does not support a finding of probable cause, which is required to obtain a search warrant. *See United States v. Bertrand*, 926 F.2d 838, 841 (9th Cir.1991) (quoting *United States v. Stanert*, 762 F.2d 775, 778–79 (9th Cir.), *amended on other grounds*, 769 F.2d 1410 (9th Cir.1985)).

### 1. Legality of the Searches

■ We review de novo whether a search is legal under the Fourth Amendment. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). We review for clear error the trial judge's findings of fact. *See id.*

### a. The Emergency Doctrine

■ Generally, the Fourth Amendment prohibits searching a residence without a warrant unless at the time of the search: (1) there is probable cause to believe that contraband or evidence of a crime will be found in the residence; and (2) exigent circumstances are present. *See United States v. Lai*, 944 F.2d 1434, 1441 (9th Cir.1991). It is a close question whether probable cause existed when Officers Yergler and Wasinger searched Apartment 3.[4] We need not decide this

4. The officers searched Apartment 3 three times prior to obtaining a warrant: (1) when they gained visual access to the apartment after telling Cervantes to open the door, *see United States v. Winsor*, 846 F.2d 1569, 1573

(9th Cir.1988) (holding that a search occurred when police officers gained visual entry into a room through a door that was opened at their command); (2) when Officers Yergler and Wasinger stepped inside the apartment for the

issue, however, because we conclude that the searches were legal under another theory—the emergency doctrine. *Cf. Murdock v. Stout*, 54 F.3d 1437, 1441 n. 3 (9th Cir.1995) ( declining to address the emergency doctrine because probable cause and exigent circumstances were present). The emergency doctrine provides that if a police officer, while investigating within the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found. *See, e.g., People v. Davis*, 442 Mich. 1, 497 N.W.2d 910, 918 (1993); *Perez v. State*, 514 S.W.2d 748, 749 (Tex.Cr.App.1974).

In *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Court noted that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonable believe that a person within is in need of immediate aid." *Id.* at 392, 98 S.Ct. 2408. The Court recognized that " '[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " *Id.* (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963)). The Court, however, found that a four-day search of an apartment where a homicide had occurred was not reasonable because there was no "emergency threatening life or limb." *Id.* at 393, 98 S.Ct. 2408.

■ Other circuits have adopted the emergency doctrine. In *United States v. Dunavan*, 485 F.2d 201 (6th Cir.1973), officers searched two locked briefcases found in the defendant's car for information regarding his identity or physical condition

after finding the defendant having a seizure and foaming at the mouth. Inside one of the briefcases the officers found money from a recent bank robbery. Finding that the search was done "as a matter of rendering emergency aid to a person in a seizure," the Sixth Circuit held that the search was reasonable and the money was admissible. *Id.* at 203–05; *cf. United States v. Miller*, 589 F.2d 1117, 1126 (1st Cir.1978) ("[I]f exigent circumstances justify warrantless entry and seizure of evidence of arson,[5] which evidence is inevitably criminal, then an emergency certainly justifies entry [into a yacht[6]] and seizure of a navigational chart, relevant to a possible drowning, which by happenstance later proves to be incriminating.") (footnote and citation omitted).

The emergency doctrine's requirements are clearly articulated in *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976), which we quoted in *Murdock*, 54 F.3d at 1441 n. 3:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609.

This court has "yet to consider whether [the *Mitchell* test], or something comparable, should be adopted in a case such as this one where police officers are investi-

---

first time; and (3) when Officer Yergler reentered the apartment after chasing the suspects. In addition, Investigator Reynolds also searched the apartment before a warrant was obtained.

**5.** The *Miller* court was referring to *Michigan v. Tyler*, 436 U.S. 499, 511, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), which held that a warrantless search is reasonable if the possible

rekindling of a fire creates an exigent situation.

**6.** Although a person has less of a privacy interest in his or her boat than in his or her residence, *see United States v. Albers*, 136 F.3d 670, 673 (9th Cir.1998), we still find the *Miller* court's reasoning persuasive.

gating a possible crime at the same time they might be rendering aid to a person in danger." *Murdock*, 54 F.3d at 1441 n. 3 (recognizing the emergency doctrine's existence, but not applying it because the court found that probable cause and exigent circumstances justified the warrantless search). We find justification for adopting the emergency doctrine, not under police officers' function as criminal investigators, but in their community caretaking function to respond to emergency situations. *See Mincey*, 437 U.S. at 392, 98 S.Ct. 2408 ("We do not question the right of the police to respond to emergency situations.").

■ The question remains, however, whether we should adopt the *Mitchell* test or some other formulation of the emergency doctrine. The *Mitchell* test's first prong requires that police officers have "reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." *Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609. We find that preservation of life or protection against serious bodily injury are sufficient justifications for intruding upon a person's privacy interests.[7] *See Mincey*, 437 U.S. at 392, 98 S.Ct. 2408.

The *Mitchell* test's second prong—that the search was not "primarily motivated by intent to arrest and seize evidence"— deserves close attention. *Mitchell*, 383 N.Y.S.2d 246, 347 N.E.2d at 609. The Supreme Court has, in the criminal investigation context, declined to inquire into an individual officer's motivations in determining whether a search or seizure is reasonable under the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 820, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In *Whren*, the Court held that a seizure supported by probable cause is reasonable

under the Fourth Amendment regardless of the actual motivations of the law enforcement officers making the stop, and regardless of whether reasonable officers faced with the same circumstances would have made the stop in absence of some other law enforcement purpose. *See id.* at 811–20, 116 S.Ct. 1769. The *Whren* court distinguished cases where probable cause is present from inventory and administrative search cases where a government actor's pretextual motivation for a search or seizure is a viable claim. *See id.* at 811–12, 116 S.Ct. 1769. The Court noted:

> [O]nly an undiscerning reader would regard these [inventory and administrative search] cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the absence of probable cause. Our quoted statements simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are not made for those purposes.

*Id.*, (citing *Colorado v. Bertine*, 479 U.S. 367, 371–72, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *New York v. Burger*, 482 U.S. 691, 702–03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)).

*Whren*, however, did not address whether an officer's motivation to search is relevant to the reasonableness of searches conducted under the emergency doctrine. Rather, by distinguishing between cases that require probable cause and those that do not, *Whren* suggests that the officer's motivation for conducting a search is still relevant where no probable cause exists,

---

**7.** Whether a search or seizure conducted for the protection of property is reasonable under the Fourth Amendment presents a more difficult question. We need not decide this issue, however, because, as discussed below, we find that the police had reasonable grounds to believe that an emergency was at hand and that their assistance was necessary to protect against death or serious bodily injury.

as is true in emergency doctrine cases. *Cf. Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) ("an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence"); *Burger*, 482 U.S. at 716–717, n. 27, 107 S.Ct. 2636 (observing that in upholding the constitutionality of a warrantless administrative inspection, the search did not appear to be "a 'pretext' for obtaining evidence of ... violation of ... penal laws"). As Professor LaFave has noted:

> It is important to remember that the foundation of the Court's position in *Whren* is that "where the search or seizure is based upon probable cause" there is with rare exception no balancing to be done or reasonableness determination to be made because the probable cause itself serves as the exclusive "measure of the lawfulness of enforcement." This being the case, it would seem that certain pretext-type claims are still viable when, as the Court put it, the case "involves police intrusion without the probable cause that is its traditional justification." * * * Moreover, in light of the way in which the Court in *Whren* distinguished inventory and administrative searches when discussing the *Scott* principle, it apparently remains open to defendants, whenever the challenged seizure or search is permitted without probable cause because of the special purpose being served, to establish a Fourth Amendment violation by showing the action was in fact undertaken for some other purpose (i.e., mainstream law enforcement).

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.4 (3d ed.1996) (footnote omitted).

We believe that, absent probable cause, examining a government actor's motivation for conducting an emergency search provides a necessary safeguard against pretextual reliance on community caretaking interests to serve criminal investigation and law enforcement functions. We thus agree with *Mitchell* that, under the emergency doctrine, "[a] search must not be primarily motivated by intent to arrest and seize evidence." 383 N.Y.S.2d 246, 347 N.E.2d at 609.

We find the third prong of the *Mitchell* test—requiring a "reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched," *id.,*—to be well reasoned. As the Court noted in *Mincey*, "a warrantless search must be strictly circumscribed by the exigencies which justify its initiation." *Mincey*, 437 U.S. at 393, 98 S.Ct. 2408 (internal quotation marks and citation omitted). Under the emergency doctrine, then, an officer's search must be limited to only those areas necessary to respond to the perceived emergency.

We thus adopt the three-part *Mitchell* test as a clear and soundly-crafted formulation of the emergency doctrine's requirements.[8] We now apply that test to the facts of this case.

### b. The Searches by Officers Yergler and Wasinger

### i. Reasonable Belief That an Emergency is at Hand and That Aid is Immediately Necessary

Officer Yergler was faced with a terrible, "sickening" chemical odor coming from Apartment 3, which he could smell as

---

**8.** We note in this case that the items seized were in "plain view." As we have previously noted, however, "the Supreme Court has limited warrantless seizures under the 'plain view' doctrine to situations where the officer has a legal right to be at the location from which the object was plainly viewed." *United States v. Bulacan*, 156 F.3d 963, 968 (9th Cir.1998) (citing *Horton v. California*, 496

U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). *See also Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.").

much as 20 feet away from the apartment. Officer Yergler, as well as the firefighters who summoned him, believed that the fumes might be associated with methamphetamine production. Officer Yergler knew from his training that methamphetamine labs are volatile and therefore reasonably feared that Apartment 3 could explode at any moment. *See United States v. Whitten,* 706 F.2d 1000, 1014 (9th Cir. 1983) (recognizing that methamphetamine labs create a risk of explosion). Officer Yergler also reasonably believed that lives were in danger if an explosion occurred. This fear was heightened by the fact that the odor was coming from an apartment building, possibly containing many people. *Cf. United States v. Martin,* 781 F.2d 671, 674 (9th Cir.1985) (holding that a potential explosion within an apartment increases the likelihood of finding exigent circumstances). Moreover, Officer Yergler testified that he witnessed several children around the apartment building. One of the apartment building's tenants had left her apartment fearing harm to herself or to her infant child. Given all of these circumstances, Officer Yergler reasonably believed that an emergency was at hand and that his assistance was immediately necessary for the protection of life.

### ii. Not Primarily Motivated by the Desire to Collect Evidence

 Officer Yergler testified that before the first search he was not sure whether the substance he smelled was caused by methamphetamine production, but he testified that given the strong noxious chemical odor and "the fact that . . . six apartments [were] there with another apartment building right across, [he] didn't want to take the chance." The district court found that Officer Yergler was "very credible" and there was no "indication . . . [that he was] trying to make up a story afterwards to justify what he did." We

review a district court's credibility determination for clear error. *See United States v. Hanley,* 190 F.3d 1017, 1031 (9th Cir.1999) (citing *United States v. Oba,* 978 F.2d 1123, 1125 (9th Cir.1992)). Upon examining the record, we conclude the district court's credibility determination is not clearly erroneous. Officer Yergler's actions after the search provide further evidence that he was primarily motivated by his concern for the safety of the apartment building's occupants. Once he had secured the premises, Officer Yergler ordered the evacuation of the building and requested the tenants to turn off any open flames.

### iii. Reasonable Basis for Associating the Place Searched with the Emergency

 Officer Yergler testified that he had identified Apartment 3 as the source of the chemical odor. He had already investigated Apartment 6 and did not find the odor's source. Moreover, the odor was stronger in front of Apartment 3 than in front of any other apartment. These facts show that Officer Yergler had a "reasonable basis, approximating probable cause," to believe that the noxious chemical odor was coming from Apartment 3. *See Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 609. Furthermore, Officer Yergler did not examine Apartment 3 more thoroughly than was necessary to search for a methamphetamine lab. He simply walked through the rooms and looked at items in plain view. *See Mincey,* 437 U.S. at 393, 98 S.Ct. 2408 ("the police may seize any evidence that is in plain view during the course of their legitimate emergency activities").[9] Thus, we agree with the district court that the officers' searches of Apartment 3 were legal.

### c. Investigator Reynolds' Search

 Unlike the searches conducted by Officers Yergler and Wasinger, Investiga-

---

9. On the other hand, "during the course of . . . legitimate emergency activities" is limited by the rule that "an unlawful secondary purpose invalidates an otherwise permissible

[emergency] search. . . ." *Bulacan,* 156 F.3d at 969 (citing *United States v. $124,570 U.S. Currency,* 873 F.2d 1240, 1247 (9th Cir. 1989)).

tor Reynolds' search of Apartment 3, does not satisfy the requirements of the emergency doctrine. By the time Investigator Reynolds entered the apartment, the risk of explosion had been defused. First, the police officers knew that there was neither lab equipment nor chemicals on the premises. Second, the apartment had been aired-out so there was no reasonable risk that the fumes could ignite. Third, there was no reasonable risk that the methamphetamine in the pot could explode because it was in its final stages of production, well past the volatile early stages of production. Fourth, the apartment had been secured by police presence, which eliminated any risk that someone might enter the apartment.

The search also was not legal under the traditional test requiring both probable cause and exigent circumstances. At the time of the fourth search, there were no exigent circumstances present. Although the risk of explosion can amount to exigent circumstances, *see United States v. Echegoyen*, 799 F.2d 1271, 1278–79 (9th Cir. 1986), that risk had been defused by the time the fourth search occurred. Therefore, the fourth search was illegal.

### 2. Legality of the Search Warrant

■■■■ A magistrate's issuance of a search warrant is reviewed for clear error and we must uphold such a warrant "so long as the [magistrate] had a 'substantial basis' for concluding probable cause existed based on the totality of the circumstances." *Bertrand*, 926 F.2d at 841 (citation omitted). In analyzing the magistrate's decision, however, we must excise the portion of the affidavit in support of the warrant application containing information that was obtained during the illegal fourth search. *See United States v. Reed*, 15 F.3d 928, 933 (9th Cir.1994) ("A reviewing court should excise the tainted evidence and determine whether

the remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.") (internal quotation marks and citation omitted).

■■■■ After excising Investigator Reynolds' observations, the warrant application shows that Officers Yergler and Wasinger: (1) smelled a strong chemical odor outside of Apartment 3 consistent with methamphetamine production; (2) were trained to know the smell of methamphetamine production; (3) have been present with the police narcotics unit in previous investigations of operational methamphetamine labs; (4) saw a large hydraulic press in Apartment 3; (5) saw a stainless steel pot on the apartment's kitchen floor, containing a brown chunky substance they believed was methamphetamine; and (6) witnessed the suspects flee Apartment 3.

Given the above facts, the magistrate had a "substantial basis" for concluding that there was probable cause to believe that contraband or evidence of a crime would be found in Apartment 3. Accordingly, the district court did not err in denying Cervantes' motion to suppress evidence.

### B. Sufficiency of the Evidence

■■■■ Cervantes contends that this court should reverse his convictions under 21 U.S.C. § 841(a)(1)[10] because the evidence was insufficient to establish that he manufactured and possessed with intent to distribute methamphetamine. We must determine whether, "viewing the evidence in the light most favorable to the government and respecting the jury's ability to judge the credibility of the witnesses, resolve factual conflicts, and draw inferences, a rational jury could have found the elements of the crime beyond a reasonable doubt." *United States v. Feldman*, 853 F.2d 648, 654 (9th Cir.1988) (citation omitted).

**10.** Section 841(a)(1) provides: "... it shall be unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

### 1. Possession With Intent to Distribute Methamphetamine

■■■■■ A conviction for possession with intent to distribute methamphetamine under § 841(a) requires that the defendant (1) knowingly (2) possessed methamphetamine (3) with intent to distribute it. *See United States v. Mora,* 876 F.2d 76, 77 (9th Cir.1989). A jury can infer both knowledge and intent from possession of a large quantity of drugs. *See United States v. Ocampo,* 937 F.2d 485, 488 (9th Cir.1991). Possession may be joint or individual, and either actual or constructive.[11] *See United States v. Soto,* 779 F.2d 558, 560 (9th Cir.), *amended on other grounds,* 793 F.2d 217 (9th Cir.1986).

■■■■■ A "defendant's mere proximity to [a] drug, her presence on the property where it is located, and her association with the person who controls it are insufficient to support a conviction for possession." *United States v. Vasquez–Chan,* 978 F.2d 546, 550 (9th Cir.1992) (citations omitted). Evidence of a defendant's dominion over a residence, however, may support an inference that the defendant controlled contraband found within that residence. *See United States v. Earl,* 27 F.3d 423, 425 (9th Cir.1994) (citing *United States v. Soyland,* 3 F.3d 1312, 1315 (9th Cir.1993)).

■■■■ Given the lack of furniture, large amount of methamphetamine, and drug producing equipment, Apartment 3 appears to have been used exclusively for making and storing methamphetamine. Cervantes was more than merely present at Apartment 3, he paid the rent, pretended to be the leaseholder, and opened the door when the police arrived. These facts could allow a rational jury to infer that Cervantes exercised control over Apartment 3 and the objects within it. *See Earl,* 27 F.3d at 425; *see also United*

*States v. Sitton,* 968 F.2d 947, 961 (9th Cir.1992). Moreover, a rational jury could also infer that Cervantes' flight from Apartment 3 suggested that he possessed the methamphetamine. *See United States v. Chambers,* 918 F.2d 1455, 1458 (9th Cir.1990) ("The nature of an attempt to flee from law enforcement officials is probative of possession as well as knowledge."). Viewing the evidence in the light most favorable to the government, a rational jury could have found that Cervantes possessed with intent to distribute the methamphetamine found in Apartment 3.

### 2. Manufacturing Methamphetamine

■■■■ Viewing the evidence in the light most favorable to the government, a rational jury could also have convicted Cervantes for manufacturing methamphetamine. To prove a violation of § 841(a)(1), the government must prove that Cervantes "(1) knowingly or intentionally (2) manufactured methamphetamine." *United States v. Basinger,* 60 F.3d 1400, 1406 (9th Cir.1995).

First, there was sufficient evidence from which the jury could find that methamphetamine was manufactured in Apartment 3. The police found 30 pounds of methamphetamine, cutting agents, a hydraulic press, and packaging materials within Apartment 3. Also, the government offered expert testimony that, at the time of Cervantes' arrest, Apartment 3 was being used to manufacture methamphetamine.

Second, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Cervantes had knowingly or intentionally manufactured the methamphetamine found in Apartment 3. Cervantes was present during the manufacturing process and offered no legitimate

---

**11.** "Actual possession connotes physical custody or actual personal dominion." *United States v. Batimana,* 623 F.2d 1366, 1369 (9th Cir.1980). Constructive possession requires that the defendant both knew of the con-

trolled substance's presence and had the power to exercise dominion and control over it. *See United States v. Behanna,* 814 F.2d 1318, 1319–20 (9th Cir.1987).

reason for being there. Cervantes' "presence in that one-room apartment reeking with tell-tale indicia of an ongoing drug-distributing enterprise could rationally have been viewed as a privilege reserved exclusively for participants." *United States v. Staten*, 581 F.2d 878, 885 (D.C.Cir.1978) (footnotes omitted). Furthermore, the evidence showed that Cervantes was the renter of the apartment, which could reasonably suggest that he controlled the activities occurring there, including the methamphetamine manufacturing. Lastly, he fled Apartment 3 upon the officers' arrival, which the jury could reasonably take as a sign that he was engaged in the illegal manufacturing occurring therein. *Cf. Chambers*, 918 F.2d at 1458 ("The nature of an attempt to flee from law enforcement officials is probative of possession as well as knowledge."). The above facts are sufficient for a rational jury to convict Cervantes of manufacturing methamphetamine.

## C. Misstatement of the Law During Summation

■ During closing argument, Cervantes objected that the government misstated the law on possession, but the district court overruled Cervantes' objection. After the trial, Cervantes moved for a new trial based, in part, on the government's purported misstatements at closing argument. The district court denied the motion. We review for an abuse of discretion the district court's decision to deny Cervantes' new trial motion based on the government's misconduct during its closing argument. *See Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir.1985).

The government made the following statements on possession during its summation:

> You can infer that if the defendant is the tenant of apartment 3, defendant has physical control over the items that are in that dwelling. . . .
>
> So the government establishes physical control by the fact that the defendant

is in the apartment on January 7th when the police get there and by the fact that the defendant is the tenant and the user of apartment 3.

> The definition [of possession] is rather simple. It says that a person has possession of something if the person knows of its presence and has physical control of it.
>
> So by paying the rent, by pretending to be the tenant of apartment 3, you can safely make the—*reach the inference* that, yes, he was the tenant at apartment 3, and as the tenant, he had physical control of the items that were inside that apartment, just like you have physical control over the things . . .

(Emphasis added.)

■ The government's closing argument repeatedly stated that the jury could infer from the facts that Cervantes possessed the methamphetamine found in Apartment 3. The government did not state that the jury *must* infer that Cervantes possessed the methamphetamine. Because a defendant's rental payments can reasonably suggest that the defendant possessed drugs found within that rental property, *see Sitton*, 968 F.2d at 961, the government did not misstate the law during its closing argument. Thus, the district court did not abuse its discretion in denying Cervantes' motion for a new trial, based on the government's statements during its closing argument.

## D. Tenant's Testimony

The tenant in Apartment 6, which is directly above Apartment 3, testified that while in her apartment on two prior occasions she had smelled a similar odor to the one which came from Apartment 3 on the day of Cervantes' arrest. Cervantes objected, claiming that the testimony was character evidence, but was overruled.

■■ We review the district court's decision to admit evidence for an abuse of discretion. *See Paine v. City of Lompoc*, 160 F.3d 562, 566 (9th Cir.1998). Federal

Rule of Evidence 404(b) does not preclude the tenant's testimony. Her testimony about a recurring odor is consistent with the government's theory that Apartment 3 was being used as a drug lab. Apartment 3's earlier use as a drug lab is relevant because it shows a continuing use and makes it more probable that Apartment 3 was being used to manufacture methamphetamine on the date that Cervantes was arrested. Thus, the tenant's testimony is relevant to the manufacturing charge. Accordingly, the district court did not abuse its discretion in admitting the tenant's testimony.

### III. CONCLUSION

We affirm the district court's denial of Cervantes' motion to suppress evidence, and its denial of Cervantes' motions for acquittal and a new trial.

**AFFIRMED**.