STATE of Wisconsin, Plaintiff-Respondent,

v.

Shane M. FERGUSON, Defendant-Appellant.†

Court of Appeals

*No. 00–0038–CR. Submitted on briefs November 6, 2000.——Decided April 3, 2001.*

## 2001 WI App 102

(Also reported in 629 N.W.2d 788.)

†Petition to review dismissed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Melinda Swartz*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, with *William L. Gansner*, assistant attorney general.

Before Fine, Schudson and Curley, JJ.

¶ 1. CURLEY, J. Shane Ferguson appeals from a judgment convicting him of manufacturing a controlled substance, marijuana, contrary to WIS. STAT. §§ 961.14(4)(t) and 961.41(1)(h)2.[1] Ferguson argues that the trial court erred in denying his suppression motion. He contends that the police were not engaged in a community caretaker function when they jimmied

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

the lock on his bedroom door, entered, and looked in a closet where they found marijuana plants growing. Under the unique facts presented here, we are satisfied that the police were serving in their role as community caretakers when they conducted the search. Thus, we affirm.

## I. BACKGROUND.

¶ 2. Although many of the events leading to Ferguson's arrest were disputed, the facts found by the trial court at the motion to suppress are as follows. On January 29, 1999, the West Allis Police Department received a 911 call regarding a fight at an apartment building on West Mitchell Street. At approximately 10:15 p.m., members of the West Allis Police Department answered the call. Before entering the building, the police encountered Deidre Foster, who, it was learned later, was eighteen years old. She was irate, angry and intoxicated.

¶ 3. Since the call initiated from Apartment 3, several officers went to that apartment to investigate the complaint. They knocked on the apartment door several times, but no one answered. While they were standing outside the door, Foster appeared, unlocked the door and stated something to the effect, "if I'm going to get arrested then everyone is." Foster then entered the apartment and yelled that the police were there and that everyone should come out.

¶ 4. The police followed Foster into her apartment. Upon entering the apartment, the police saw two teenagers in the living room. The police observed that the two teenagers appeared to have been consuming alcoholic beverages, but the police did not believe they were highly intoxicated. The police confirmed that the two teenagers were underage. The police also noticed

numerous open beer bottles and several empty gallon bottles of hard liquor strewn around the apartment. The officers surmised that a lot of alcohol had recently been consumed in the apartment. One of the police officers asked Foster if they could take a look around and she agreed. This search led the officer to the bathroom, where he found a highly intoxicated young man lying on the floor. He was sick and had been vomiting. This individual, too, was underage. The young man was so unsteady on his feet as a result of his alcohol consumption that the police had to physically assist him in walking.

¶ 5. A further search of the apartment revealed a locked bedroom door. It had a push-button type lock which is engaged by pushing a button from inside the room. As a result, the police strongly suspected that someone was in the room. Foster told the officers that the room belonged to Ferguson and that he was at work, but when the police called Ferguson's place of employment, they learned that he had not been to work for several days. The police then became concerned that Ferguson might be in the room, highly intoxicated, like the teenager found in the bathroom, and that he might need assistance. While the police were contemplating what to do, one of the two teenagers found in the living room volunteered that three people were in the bedroom. Fearing that additional underage persons were in the bedroom, either ill or passed out from consuming intoxicants, the police began knocking on the door and yelling for whoever was in the room to come out. Despite numerous knocks on the door and loud yelling, no one responded. After about thirty minutes, the police finally jimmied the door open. Upon entering, the police observed that the room was very messy, with piles of clothing on the floor, and that there

were people, including Ferguson, in the bed. Thinking that someone could have been hidden in the closet and passed out, one of the officers opened the closet door and discovered the marijuana plants.

¶ 6. Ferguson was charged with the manufacture of marijuana. He waived his preliminary hearing and filed a motion to suppress. After hearing the testimony of several witnesses, the trial court found that the police properly entered the bedroom and that the search of the closet was also reasonable. The trial court held that, although the police searched the bedroom and closet without a warrant, they did so in their capacity as community caretakers. Ferguson then pled guilty and was sentenced to a stayed sentence of one year and was placed on two years' probation.

## II. ANALYSIS.

¶ 7. Ferguson contends that the trial court erred in denying his motion to suppress. He claims that the State failed to establish, by a clear preponderance of the evidence, that the search was a justifiable governmental action. Ferguson argues that he had exercised his right to privacy by closing and locking the door, and that the search was illegal because the police lacked a warrant to search either his bedroom or his closet.[2] In support of his position, Ferguson notes that, despite the presence of the police in the apartment for at least thirty minutes, the police failed to make any attempt to obtain a search warrant for his bedroom or the closet. Ferguson also disputes the trial court's finding that the officers' warrantless entry into Ferguson's bedroom

---

[2] In the trial court, Ferguson also argued that the police did not have permission to enter the apartment. That issue has since been abandoned.

23

and closet was justified under the community caretaker exception. He states that the police were conducting an investigation of underage drinkers, which was essentially a criminal investigation, and thus, the police were not acting in a community caretaker capacity. Further, he notes that the police never called for paramedics, nor did they personally render medical assistance to anyone, thus negating any claim of acting in a community caretaker role. Ferguson equates his situation with that in *State v. Dull*, 211 Wis. 2d 652, 565 N.W.2d 575 (Ct. App. 1997), where this court concluded that the circumstances did not permit the warrantless entry into the defendant's home or bedroom. We are not persuaded by Ferguson's arguments.

¶ 8. A determination of whether a search and seizure is constitutional is a question of law which this court reviews *de novo. State v. Guzman*, 166 Wis. 2d 577, 586, 480 N.W.2d 446, *cert. denied*, 504 U.S. 978 (1992). However, the trial court's findings of fact will be upheld unless they are contrary to the great weight and clear preponderance of the evidence. *State v. Richardson*, 156 Wis. 2d 128, 137, 456 N.W.2d 830 (1990). After reviewing the record, we conclude that the trial court's findings are not contrary to the great weight and clear preponderance of the evidence.

¶ 9. A warrantless search of a house is presumptively unreasonable as both the Fourth Amendment to the United States Constitution and Article I, § 11 of the Wisconsin Constitution prohibit unreasonable searches and seizures. Some exceptions to this rule do exist, however.

> "Our laws recognize that, under special circumstances, it would be unrealistic and contrary to public policy to bar law enforcement officials at the doorstep." Therefore, a handful of exceptions have been "jealously and carefully drawn" to balance the interests of the individual with those of the State.

*State v. Paterson*, 220 Wis. 2d 526, 532–33, 583 N.W.2d 190 (Ct. App. 1998) (citations omitted).

¶ 10. It is undisputed that the seizure of the contraband was a seizure "within the meaning of the fourth amendment," but the State contended, and the trial court agreed, that the officers' actions fell under the community caretaker exception. The community caretaker exception originated in *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973). There, the Supreme Court approved the warrantless search of a vehicle because the police were engaged in "what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441.

¶ 11. Our supreme court first recognized the "community caretaker" exception in *Bies v. State*, 76 Wis. 2d 457, 251 N.W.2d 461 (1977). Later, a test for applying the community caretaking exception to the Fourth Amendment was announced in *State v. Anderson*, 142 Wis. 2d 162, 417 N.W.2d 411 (Ct. App. 1987), *rev'd on other grounds*, 155 Wis. 2d 77, 454 N.W.2d 763 (1990).

¶ 12. After applying the *Anderson* test, we are satisfied that the police actions here qualified as "community caretaker." A search, to qualify as a community caretaker exception, requires an examination of three factors:

We conclude that when a community caretaker function is asserted . . . the trial court must determine: (1) that a seizure within the meaning of the fourth amendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual.

*Anderson*, 142 Wis. 2d at 169.

As to the last factor—weighing the public need and interest against the intrusion—relevant considerations include: (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.* at 169–70.

¶ 13. It is conceded that a seizure occurred within the meaning of the Fourth Amendment. Therefore, we address the last two *Anderson* factors. First, we conclude that the police were engaged in a "bonafide community caretaker activity" when they found the marijuana. The police were called to a fight when they went to Apartment 3. Someone in Apartment 3 made the complaint about the alleged fight in Apartment 2. Thus, the police were unaware of any wrongdoing in Apartment 3 when they arrived. Further, the police were not investigating a crime after encountering several underage drinkers in the apartment. This is so because underage drinking is not a crime. *See* WIS. STAT. § 939.12 ("conduct punishable only by a forfeiture is not a crime"). While underage drinkers are subject to

arrest, an underage drinker is only subject to a forfeiture action. *See* WIS. STAT. §§ 125.07(4)(b) and 938.344. Thus, the police decision to investigate whether additional underage drinkers were in the apartment was not *per se* a "criminal" investigation.

¶ 14. Ferguson suggests that the police action was a typical criminal investigation. We disagree. It was only after the police could not eliminate the possibility that Ferguson was in the bedroom, and after they unsuccessfully attempted to have the occupants come out voluntarily to confirm their well-being, that the police entered the bedroom. Further, it was established that the only purpose in opening the closet door was to confirm that no highly intoxicated person was hiding there.

¶ 15. Further, the trial court's finding that the motivation for the police to enter Ferguson's bedroom closet was to assist him, not to arrest, is not clearly erroneous. As noted, before entering Ferguson's bedroom, the police knew that: (1) Foster was intoxicated, another severely intoxicated teenager was found in the bathroom, and two other teenagers had been drinking; (2) evidence of large amounts of alcohol consumption was seen in the apartment; and (3) someone was in the bedroom who failed to respond or come out of the room. In light of the circumstances, it was reasonable for the police to be concerned about the bedroom occupants' physical conditions, particularly since the police received no response to their knocking and yelling, strongly suggesting that the additional persons in the bedroom were incapacitated.

¶ 16. Finally, in examining the last factor in the *Anderson* test, the public need versus Ferguson's interest against the intrusion, again we are satisfied that

the search undertaken by the police was appropriate and outweighed any intrusion into Ferguson's privacy. The police, sent to investigate a complaint of a fight, were suddenly confronted with four intoxicated teenagers, two of whom were highly intoxicated. Contrary to Ferguson's contention that the police rendered no aid, the record reveals that the police quieted down Foster and assisted the other teenager in walking to the bathroom on several occasions. Thus, in applying the balancing test, we determine, under the exigent circumstances presented here, that the officers' reasons for entry outweighed Ferguson's privacy rights. Thus, under the *Anderson* test, we are satisfied that the officers were engaged in a community caretaker function when the search was conducted.

■

¶ 17. Recently, the Ninth Circuit United States Court of Appeals, in *United States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000), adopted a three-part test for determining whether a warrantless entry into a home pursuant to the "emergency doctrine" is a Fourth Amendment violation. This test is similar to the community caretaker test found in *Anderson*, and provides:

> "(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched."

*Cervantes*, 219 F.3d at 888 (quoting *People v. Mitchell*, 347 N.E.2d 607, 609 (N.Y. 1976)).

¶ 18. An application of this test supports our conclusion that the police were engaged in a community caretaker role when they entered the bedroom and searched the closet.

¶ 19. Under the *Cervantes* test, the police must have reasonable grounds to believe there was an "emergency at hand." Here, such grounds existed. The police found four intoxicated youths. One was so severely intoxicated that he could not stand unassisted. Signs of consumption of large amounts of alcohol were also seen in the apartment. Further, the police had been told that three people were in the bedroom, but no one responded to knocking and yelling. Coupling these facts together, we conclude the police reasonably believed that there was an "immediate need for their assistance for the protection of life."

■

¶ 20. The next factor examines the police motivation for the search. Here, the motivation for the police action was not a desire to arrest or seize evidence. Rather, the police wanted to prevent serious harm or to render aid to any highly intoxicated persons found in either the bedroom or the closet. Finally, the third factor requires the police to have "probable cause" that the area to be searched is connected to the emergency. There was good reason here for the police to associate the emergency with Ferguson's bedroom and closet. The police strongly suspected that someone was in the room because the lock on the door suggested it and because they were told three people were in the room who were not responding. Thus, the bedroom was intrinsically linked to the emergency. In applying the *Cervantes* three-part test to the facts of this case, we are satisfied that the police actions under the emer-

gency doctrine, as well as the "community caretaker" exception, did not violate the Fourth Amendment.

¶ 21. Ferguson cites *Dull* as being on point. However, the police actions and circumstances here differ in several respects from those found in *Dull*. Unlike the facts in *Dull*, where the police entered the house almost immediately after discovering an underage drinker in the driveway of his house and found Dull engaged in a sex act with a minor, here the police utilized alternative methods of confirming whether anyone was in the room before entering. They took the trouble to call Ferguson's employer to locate him, and then they yelled and knocked for approximately thirty minutes. In *Dull*, the police made no attempts at contacting the underage drinker's mother, nor did they attempt to phone the house. Moreover, in *Dull*, the juvenile advised the officer against entering his home and only acquiesced when the officer would not permit the juvenile to get his brother.

¶ 22. However, the biggest distinction between the cases lies with the fact that the police in *Dull* were not faced with an emergency such as occurred here. Unlike the facts in *Dull*, the police here never stepped out of their caretaking role. Although consuming alcoholic beverages by a minor occurred in both cases, the police in this case did not know the number of people present in the apartment or their physical condition. Thus, the situation here was fluid where the situation in *Dull* was concluded with the detention of the juvenile. Further, once inside the bedroom, given the facts known to the officers and the disarray they observed, it was reasonable for the police to open the closet door to see if anyone was hiding there. Thus, we determine, as did the trial court, that the police were conducting a

bona fide community caretaker activity when they searched Ferguson's bedroom and closet.

¶ 23. Consequently, the search of the bedroom and the closet was permissible. Accordingly, we affirm the judgment of the trial court.

*By the Court.*—Judgment affirmed.

¶ 24. FINE, J. (*concurring*). I fully join in the majority decision, but write separately to note that if the police did what the dissent says that under the law they were required to do—namely, without trying to see if Ferguson was all right and that there was no one in the closet who was ill, perhaps life-threateningly ill, we might not be deciding Ferguson's appeal but, rather, an appeal in a civil lawsuit claiming that the police ignored their community-caretaking function and thus left a juvenile to die in his or her own alcohol-induced vomit. In my view, the distinctions between *Dull* and this case are clear, as the majority opinion so carefully explains. The police here should be commended for their thoroughness and concern.

¶ 25. SCHUDSON, J. (*dissenting*). Although the police conduct in this case seems reasonable, it does not qualify under the community caretaking function as interpreted and applied in *State v. Dull*, 211 Wis. 2d 652, 565 N.W.2d 575 (Ct. App. 1997).

¶ 26. In *Dull*, we acknowledged that "the deputy may have properly monitored [the juvenile] as [he] proceeded into the house, down the stairs and to [Dull's] closed bedroom door." *Dull*, 211 Wis. 2d at 663. We recognized that that was "as far as [*Washington v.*] *Chrisman* [455 U.S. 1 (1982)] took the deputy." *Id.* Consequently, we held that "*Chrisman* does *not* justify

what the deputy did in this case"—opening the bedroom door. *Id.* at 662–63 (emphasis added).

¶ 27. In *Dull,* as in *Chrisman, a law enforcement officer was monitoring the movements of a person in custody.* Despite that fact, this court concluded that "the deputy's separate decision to open [the juvenile's older brother's] bedroom door" was within neither the proper scope of such monitoring nor the proper scope of the community caretaker function. *Dull,* 211 Wis. 2d at 660–63. In the instant case, the circumstances do not even include the monitoring of a person in custody. Thus, if anything, Ferguson's arguments are stronger than those offered by the appellant in *Dull.*

¶ 28. The majority has struggled, unsuccessfully I think, to distinguish *Dull* in order to support the police conduct in this case. Although I appreciate the majority's effort, I am hopeful that the supreme court, should it have the opportunity to examine the instant case, will take a different approach and, in doing so, will consider the serious problems *Dull* brings to the real world of policing.

¶ 29. This case is a difficult one and, as the majority has explained, the police conduct seems so prudent for so many reasons. Indeed, I am quite uncomfortable with *Dull*'s implication that the community caretaking function can be so certainly segmented—from hallway to room or, in this case, from room to closet. Lives depend on police "erring," if at all, on the side of safety for those desperately needing help, lying behind closed doors.[1]

---

[1] Thus, I share the concurring opinion's concern that had the police failed to act as they did, a life might have been lost. Therefore, only delicately disagreeing with the majority, I voice added concern about what I view as the dangers flowing from *State v. Dull,* 211 Wis. 2d 652, 565 N.W.2d 575 (Ct. App. 1997).

¶ 30. Still, until the supreme court says otherwise, *Dull* must be followed carefully. Because, under *Dull*, the police search—of the closet, at the very least—was improper, I reluctantly and respectfully dissent.