2005-NMSC-005

108 P.3d 1032

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Patrick Clark RYON, Defendant–Respondent.**

No. 28,462.

Supreme Court of New Mexico.

March 3, 2005.

Patricia A. Madrid, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM, for Petitioner.

James R. Lally, Alameda, NM, Dane Eric Hannum, Albuquerque, NM, for Respondent.

## OPINION

MINZNER, Justice.

{1} The State has appealed from a decision of the district court granting Defendant's motion to suppress evidence discovered in his home during a warrantless, nonconsensual search by police. The State appealed pursuant to NMSA 1978, Section 39-3-3(B)(2) (1972). The district court suppressed the evidence on the ground that the community

caretaker exception to the warrant require- ment was not applicable. The Court of Ap- peals affirmed the district court in a Memo- randum Opinion. *See State v. Ryon,* No. 23,318 (N.M.Ct.App. Jan. 6, 2004). Both courts relied on *State v. Nemeth,* 2001– NMCA–029, 130 N.M. 261, 23 P.3d 936. We granted certiorari to determine whether the community caretaker exception permits po- lice to enter a dwelling without a warrant or consent during a criminal investigation. We hold that in narrowly limited circumstances police may enter a home without a warrant or consent during a criminal investigation under the emergency assistance doctrine. To the extent that it may be read to preclude an emergency entry during a criminal inves- tigation, we overrule *Nemeth.* We also clari- fy the scope of the community caretaker exception. We affirm the district court's de- cision to suppress evidence, because the po- lice lacked the objective reasonableness re- quired to enter and search Defendant's home.

### I.

{2} The facts are taken from testimony at the suppression hearing and are mostly un- disputed. At approximately 8:20 p.m. on January 18, 2002, Deputy Sanchez and Depu- ty Benavidez of the Bernalillo County Sher- iff's Department responded to a dispatch to 128 Alameda N.W. in Albuquerque, New Mexico for a "911 call welfare check" with a "possible stabbing victim." When she ar- rived, Sanchez saw a man and a woman outside the home. The man, Isaac Atencio, was bleeding heavily from the head, and the woman, Barbara Hoover, was crying and yelling. Sanchez noticed that there was blood all over, but that Atencio was conscious and walking. As she was checking his stab wounds, both Atencio and Hoover told the deputy that Defendant, Hoover's boyfriend, was responsible for the stabbing and that he lived down the street at 9047 Fourth Street. Sergeant Sanchez and a field investigator

arrived at the scene within minutes to assist the deputies. While the deputy was helping Atencio and trying to calm Hoover, the ser- geant and Benavidez checked the home to ensure that there were no other victims in- side and that Defendant was no longer pres- ent. Rescue personnel arrived within about five minutes and transported Atencio to the hospital.

{3} As Deputy Sanchez approached the field investigator, a man who was covered in blood approached, identified himself as De- fendant, and stated that he wanted to tell her what happened. He was immediately hand- cuffed, frisked, and Mirandized. He told her that he and Hoover were fighting, and when Atencio tried to intervene, he withdrew his knife and stabbed Atencio. No weapons were found on Defendant. It was about 8:45–8:50 p.m. when Defendant returned to the crime scene.[1]

{4} Shortly after deputies arrived at the crime scene on Alameda, Deputies Pepin, Neel, and Hampsten, who were in separate patrol cars and heard the first dispatch, re- sponded to a second dispatch to locate the suspect whom they were told might be en route to his home at 9047 Fourth Street. As they were driving to that location, a third dispatcher informed them that the suspect might have a head or face injury, although the source of this information was not given.[2] The State estimates that deputies arrived at Defendant's home, which was one of two residences on the property, between 8:25 and 8:30 p.m. Hampsten was to watch the side and back of the home, while Pepin and Neel tried to contact Defendant inside. Both Pe- pin and Neel testified that the front door was ajar, and the lights were on. Pepin recalled that the door was open "six, seven inches to a foot," while Neel said it was just barely cracked open, about "an inch to an inch and a half." The deputies knocked and announced, called inside, but received no response. Both deputies testified that they went to the home

---

1. Defendant's mother testified that she and her husband saw Defendant walking away from his home at about 8:30 p.m. when they were re- turning to their home, which is on the same property as Defendant's home. At about 9:00 p.m., she saw police at her son's home. Defen- dant agreed that it takes about 15 minutes to

walk from his house to Hoover's house on Alameda where he was arrested.

2. Sanchez testified that the sergeant most likely relayed any information to dispatch.

looking for the suspect. Thinking it was odd for the door to be open with no one answering, and knowing that he "may have sustained a head wound of some sort," Pepin testified that they decided to enter the home to see if anybody was injured inside, and that it was "pretty cold outside." On cross examination, he admitted that he went into the home looking for the suspect, but then clarified on redirect, that he entered the home looking for a person with a "possible head injury." Neel testified that they entered the home to look for the suspect and to see if he needed medical attention: "My job there was to make sure that no one else in that house needed aid fast.... My job was to locate the suspect."

{5} According to the deputies, the home was small; to the left of the front door was a hall that led to a bathroom and bedroom, and to the right was a living room with a kitchen in it. After walking down the hall, from room to room, and finding no one inside, they returned to the front of the house. On the way out, they noticed in the kitchen sink a "folding-type knife" that appeared to be stained with blood. Without touching anything, the deputies secured the home and obtained a search warrant.

{6} Defendant filed two motions to suppress evidence "seized or observed" by deputies during the warrantless search of his home and from a search warrant that was executed later that night. Both motions alleged that the evidence was obtained in violation of the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution.[3] In response to the first motion, the State argued that the warrantless search of the home was reasonable under the community caretaker exception. It did not argue that the officers had probable cause together with exigent circumstances to enter Defendant's home without a warrant. Deputies Sanchez, Pepin, and Neel testified at the suppression hearing, and an offer of proof was made on behalf of Defendant and his mother to establish the relevant time frames.

{7} After the hearing, the district court applied the community caretaker exception articulated in *Nemeth* and found the search was unlawful. 2001–NMCA–029, ¶¶ 37–38, 130 N.M. 261, 23 P.3d 936. The court noted that under *Nemeth,* the exception "can be invoked only 'when the police are not engaged in crime-solving activities.' " *See id.* ¶ 38 (quoting *People v. Davis,* 442 Mich. 1, 497 N.W.2d 910, 920 (1993)). Applying the law to the facts, the court concluded:

> The Officers were clearly responding to the Defendant's home to locate a criminal suspect. At least in substantial part they were engaged in crime-solving activities. The facts within their knowledge were lacking any indication about source of the information, the likelihood that an injury occurred, the nature or severity of the injury, if any, how it occurred and when it might have occurred in relation to their response. Much of this information (known to fellow officers a short distance away) would have been important to formation of a reasonable belief that the Defendant was in need of immediate medical attention. In summary, the facts within the entering officers' knowledge were not sufficient to elevate their primary role to that of community caretaking.
>
> · · ·
>
> ... It appears to this Court that the officers were acting with good intentions and good faith belief that their entry into the Defendant's residence was permissible to determine whether the Defendant whom they sought was inside and injured.

{8} In affirming the district court decision to suppress the evidence, the Court of Appeals concluded that entry into a private home without a warrant is reasonable only if the State establishes that entry was necessitated by exigent circumstances, an emergency situation, or articulable public safety reasons, and that the officer was acting without reasonable suspicion of criminal activity as a community caretaker. *Ryon,* No. 23,318,

---

3. While Defendant indicated that the New Mexico constitution was violated by these searches, he did not argue that our state constitution offered more protection than the federal constitution.

We limit our discussion to a Fourth Amendment analysis. *State v. Gomez,* 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1.

slip. op. at 5. The Court of Appeals concluded that the community caretaker exception was not applicable because the deputies in this case were investigating a crime in which Defendant was a suspect. *Id.* at 6–7. Applying a deferential standard of review, the court held that there was substantial evidence to support the district court finding that the entering deputies did not have enough information to form a reasonable belief that Defendant was in immediate need of medical attention. *Id.* We granted the State's petition for certiorari. *See* Rule 12–502 NMRA 2004.

{9} On appeal to this Court the State argues that the Court of Appeals should have reviewed the reasonableness issue de novo and that both courts misstated the law by relying on *Nemeth* and applying a "strict, no investigative purpose test." The State contends that the community caretaker exception applies to this case. The State acknowledges that some courts distinguish the exception from a principle sometimes described as the emergency assistance doctrine but contends that the entry was lawful under either the exception or the doctrine. In his answer brief, Defendant argues that the State did not show facts sufficient to satisfy the community caretaker exception. At oral argument, however, he argued that a warrantless entry into the home is lawful only in an emergency. We believe that both parties agree that the proper test for this case was established in *People v. Mitchell,* 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976). The parties disagree on the application of that test.

{10} The State advocates the *Nemeth* "good faith" standard, i.e. that the entry must not have been a pretext to find evidence or arrest a suspect. The State notes the district court found that the deputies were acting in good faith. Defendant advocates the *Mitchell* "primary motivation" standard and notes the district court found that the deputies were primarily engaged in crime-solving activities. The State contends that the facts and circumstances in this case require a conclusion that an emergency entry was objectively reasonable. Defendant contends, on the other hand, that the State

failed to show an objectively reasonable entry, because it was unclear to the officers whether Defendant was injured. We address the community caretaker exception, the emergency assistance doctrine, the relationship of one to the other, and clarify the test to be applied. We then apply that test.

## II.

{11} Appellate courts review a district court's decision to suppress evidence based on the legality of a search as a mixed question of fact and law. *State v. Vandenberg,* 2003–NMSC–030, ¶ 17, 134 N.M. 566, 81 P.3d 19. We view the facts in the light most favorable to the prevailing party and defer to the district court's findings of historical facts and witness credibility when supported by substantial evidence. *State v. Urioste,* 2002–NMSC–023, ¶ 6, 132 N.M. 592, 52 P.3d 964; *State v. Jason L.,* 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856. The legality of a search, however, ultimately turns on the question of reasonableness. *Id.* Although our inquiry is necessarily fact-based it compels a careful balancing of constitutional values, which extends beyond fact-finding, "to shape the parameters of police conduct by placing the constitutional requirement of reasonableness in factual context...." *Vandenberg,* 2003–NMSC–030, ¶ 19, 134 N.M. 566, 81 P.3d 19 (quoting *State v. Attaway,* 117 N.M. 141, 145, 870 P.2d 103, 107 (1994)). We thus review the determination of reasonableness de novo. *Id.* In light of the arguments and decisions below, we take this opportunity to clarify the scope of the community caretaker exception. Our analysis necessarily begins with a review of the development of that exception.

## A.

{12} The community caretaker exception was first recognized by the United States Supreme Court in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The defendant, a police officer from Chicago, was involved in a one-car accident in his rental car near a small Wisconsin town, and later was arrested for DWI. *Id.* at 435–36, 93 S.Ct. 2523. The car was towed to a

yard several miles away where it was left unguarded. *Id.* at 436, 93 S.Ct. 2523. The next day, an officer searched the car and its trunk to retrieve the defendant's service revolver based on his belief that Chicago police were required to carry their revolvers at all times and a public safety concern that the unattended vehicle might be vandalized and the gun stolen. *Id.* at 437, 93 S.Ct. 2523. He discovered several blood-stained articles; that discovery led to the discovery of more incriminating evidence and ultimately to the defendant's murder conviction. *Id.* at 434, 437–39, 93 S.Ct. 2523. The United States Supreme Court held that the initial warrantless search of the trunk was lawful under the Fourth Amendment. "[T]he justification [for the warrantless search] ... was [an] immediate and constitutionally reasonable ... concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447, 93 S.Ct. 2523.

{13} In *Cady* the Court announced two important principles. It recognized that police have dual roles as criminal investigators and community caretakers. They function as community caretakers, for example, in assisting those whose vehicles are disabled. This function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 S.Ct. 2523. The Court also recognized that there is a "constitutional difference between searches of and seizures from houses ... and from vehicles [that] stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence ... of a crime...." *Id.* at 442, 93 S.Ct. 2523.

{14} The United States Supreme Court has never applied the community caretaker exception to a police-citizen encounter in the home, but it has approved in dicta an emergency assistance doctrine that would permit officers to search a home without a warrant, even if they were engaged in crime-solving activities. *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see Thompson v. Louisiana,* 469 U.S. 17, 21, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) (per curiam); *McDonald v. United States,* 335 U.S. 451, 454, 69 S.Ct. 191, 93 L.Ed. 153 (1948) ("This is not a case where the officers, passing on the street, hear a shot and a cry for help and demand entrance in the name of the law."). In *Mincey,* an officer was shot while undercover agents were executing a narcotics raid at the defendant's apartment. *Id.* at 387, 98 S.Ct. 2408. The agents conducted a quick sweep of the apartment for additional victims, locating two wounded victims and the defendant. *Id.* After summoning medical help and securing the residence, they waited, without searching any further, for additional officers to take over the investigation. *Id.* at 388, 98 S.Ct. 2408. Homicide detectives, who arrived shortly after, embarked on a four-day "exhaustive and intrusive" search of the home without a warrant, which led to the defendant's murder conviction. *Id.* at 388–89, 98 S.Ct. 2408.

{15} The United States Supreme Court addressed the issue of whether a warrant is required when police confront an emergency situation presented by a possible homicide. *Id.* at 392, 98 S.Ct. 2408. Although it declined to find that there were any exigent circumstances present to justify the four-day search, the Court recognized an emergency assistance doctrine and described the circumstances that would make a warrantless entry and search of a home reasonable under the Fourth Amendment. *Id.* at 392–94, 98 S.Ct. 2408.

> We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.... "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Wayne v. United States,* 115 U.S.App. D.C. 234, 241, 318 F.2d 205, 212, [1963] (opinion of Burger, J.). And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.

But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio,* 392 U.S. [1,] 25–26 [88 S.Ct. 1868, 20 L.Ed.2d 889] [1968].

*Id.* at 392–93, 98 S.Ct. 2408 (footnotes and citations other than quoted authorities omitted). The Court cautioned that "warrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement *so compelling* that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* at 393–94, 98 S.Ct. 2408 (quoting *McDonald,* 335 U.S. at 456, 69 S.Ct. 191) (emphasis added).

{16} In New Mexico we have recognized that officers may stop a vehicle on a public road without probable cause or reasonable suspicion on the basis of a "specific, articulable safety concern" in their capacity as community caretakers. *State v. Reynolds,* 117 N.M. 23, 25, 868 P.2d 668, 670 (Ct.App.1993), *rev'd on other grounds,* 119 N.M. 383, 890 P.2d 1315 (1995). On appeal, this Court noted that " '[i]n a community caretaker case, reasonableness is determined by balancing the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen.' " *Reynolds,* 119 N.M. at 388, 890 P.2d at 1320 (alteration in original) (quoting *State v. Ellenbecker,* 159 Wis.2d 91, 464 N.W.2d 427, 429 (Ct.App.1990)). We had no occasion in *Reynolds,* however, to examine the parameters of this doctrine, since the lawfulness of the stop was uncontroverted. *Id.* at 384, 890 P.2d at 1316.

{17} Until recently, use of the community caretaker exception in New Mexico has been limited to the "public servant" function of police, under *Cady,* in their encounters with citizens and vehicles on public roads. *See generally State v. Walters,* 1997–NMCA–013, 123 N.M. 88, 934 P.2d 282; *Apodaca v. State Taxation and Revenue Dep't,* 118 N.M. 624, 884 P.2d 515 (Ct.App.1994); *see also Reynolds,* 117 N.M. at 25, 868 P.2d at 670. We have viewed community caretaking as a principle outside the scope of the Fourth Amendment, reasoning that the initial police-citizen encounter was consensual and motivated by a concern for public safety, rather than a criminal investigation. *Jason L.,* 2000–NMSC–018, ¶ 14, 129 N.M. 119, 2 P.3d 856 ("[C]ommunity caretaking encounters are consensual, beyond the scope of the Fourth Amendment." Thus, "police do not need any justification to approach a person and ask that individual questions . . . .").

**B.**

{18} *Nemeth* was a departure from our earlier application of the community caretaker exception. In *Nemeth,* the Court of Appeals broadly extended the exception to justify a forceful entry into the home by police without a warrant, provided they enter solely out of concern for the person's welfare. 2001–NMCA–029, ¶¶ 21, 38, 130 N.M. 261, 23 P.3d 936. In *Nemeth,* police were investigating a possible suicide attempt and were told by dispatch that defendant had threatened to hurt herself during an argument over the telephone with her boyfriend. *Id.* ¶ 3. When they arrived the home was dark, there were no signs of activity, and there were keys on the front porch with a note that they belonged to "Mike Wells." *Id.* ¶ 5. The officers knocked at the front door, and when she did not respond, they walked around the home knocking on windows and doors. *Id.* ¶¶ 5–6. When she finally opened the door, the defendant was crying and appeared to be very distraught and emotional. *Id.* ¶ 6. Her agitation level escalated as she twice demanded they leave, assured them that she was not a danger to herself or anyone, and attempted to close the door. *Id.* ¶¶ 6–7. Concerned for her welfare, the officers forced their way into her home. *Id.* ¶¶ 7–8. Once inside, she grew more agitated, and finally shoved her identification cards into one officer's mouth. *Id.* ¶ 13.

{19} In *Nemeth,* the Court of Appeals made two important observations with which we agree. First, the Court recognized that in some cases the community caretaker exception might apply to a nonconsensual police-citizen encounter implicating the Fourth Amendment. *Id.* ¶¶ 26–27. Next, it emphasized an intrusion into the privacy and sanctity of the home must be guarded with "careful vigilance" and permitted "only in carefully

thought-through and clearly justifiable circumstances." *Id.* ¶ 30. We agree with both observations.

▆▆▆ {20} In *Jason L.*, we cited *State v. Walters*, 1997–NMCA–013, 123 N.M. 88, 934 P.2d 282, for the basic premise that, "community caretaking encounters are consensual, beyond the scope of the Fourth Amendment," although we did not decide that case under the community caretaker exception. 2000–NMSC–018, ¶¶ 14, 22, 129 N.M. 119, 2 P.3d 856. We acknowledge that our description of community caretaking encounters was wrong. *Walters* involved a voluntary roadside encounter between an officer and defendant that led to reasonable suspicion for defendant's arrest for driving while intoxicated; the court upheld the encounter as lawful under the community caretaker exception. *Id.* ¶¶ 25–26. Relying on *State v. Lopez*, 109 N.M. 169, 171, 783 P.2d 479, 481 (Ct.App. 1989), the court characterized the community caretaker exception as a voluntary police-citizen encounter that fell outside the Fourth Amendment. *Id.* ¶ 10. Characterization of the exception as a voluntary or consensual encounter was wrong. *Lopez* was not a community caretaker encounter case; the three types of police-citizen encounters it described (consensual encounters, investigatory detentions, and arrests) occur when police are investigating a crime or a suspected crime. Consent is an exception to the Fourth Amendment probable cause and reasonable suspicion requirements that police often rely on to investigate suspected criminal activity. *See, e.g., State v. Gutierrez*, 2004–NMCA–081, ¶ 6, 136 N.M. 18, 94 P.3d 18 (recognizing consensual searches and seizures are one exception to the warrant requirement). When police act as community caretakers, however, the existence of reasonable suspicion or grounds for probable cause are not appropriate inquiries. *Davis*, 497 N.W.2d at 919 (citing *Cady*, 413 U.S. at 441, 93 S.Ct. 2523). The reasonableness of such conduct depends on whether the legal standards that justify the community caretaker exception are satisfied, which as the Court of Appeals has observed, depends on particular facts, which may or may not involve a consensual encounter. *Nemeth*, 2001–NMCA–029, ¶ 26, 130 N.M. 261, 23 P.3d 936. *Jason L.* and *Walters* ought not be viewed as limiting the community caretaker exception to voluntary or consensual police-citizen encounters. *Nemeth* was correct to question our characterization of the exception.

{21} *Nemeth* was also correct to emphasize the constitutional significance of a warrantless intrusion into a home. *Id.* ¶ 30. Yet we are concerned *Nemeth* does not convey the urgency required to make a warrantless intrusion into a home, even to provide emergency assistance, reasonable. In its analysis, the court concluded that the terms "community caretaker," "emergency aid or assistance," and "exigent circumstances" doctrines are basically different descriptions of the same community caretaker function. *Id.* ¶¶ 32–36. Although the court seemed to analyze the case under the emergency assistance doctrine, it ultimately held that when police enter a home in response to a suicide, they are performing a more generic community caretaker function, the primary characteristic of which is the absence of concern by police about violations of the law. *Id.* ¶¶ 34–40. No warrant was required, because the entry was a welfare check or a "public service" that fit squarely within the community caretaker doctrine, since the officers reasonably believed defendant was suicidal, in need of immediate assistance, and they limited the intrusion by only trying to ascertain whether they could assist her. *Id.* ¶ 40.

{22} We agree with *Nemeth* to the extent it holds that police are constitutionally permitted to enter a home without a warrant or consent in some situations. We disagree with *Nemeth* that all three terms are simply different descriptions of a general community caretaker function. Although there are similarities, there are also differences. Each term is unique; each term reflects a particular search or seizure; each term has become associated with a different test, one that enables a court to assess its applicability to a particular search and seizure. The decision in *Nemeth* to conflate the emergency assistance doctrine with the broader community caretaker exception and hold that officers were merely performing a welfare check or "public service" is understandable, but we are not persuaded the decision is appropri-

ate. *Cf. Laney,* 117 S.W.3d at 860 (observing that the existence of various titles for "the different doctrines setting forth exceptions to the warrant requirements of the Fourth Amendment" result "in confusion over the proper application of the correct doctrine"). We conclude the relevant test for the emergency assistance doctrine is unique; a search within a home raises unique concerns. The facts of this case require analysis under the test appropriate to the emergency assistance doctrine.

### C.

■■■ {23} The touchstone of search and seizure analysis is whether a person has a constitutionally recognized expectation of privacy. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring). The constitutional distinction between vehicles and homes turns on this privacy expectation. A lesser expectation of privacy attaches to a vehicle. *See Cady,* 413 U.S. at 442, 93 S.Ct. 2523; *Gomez,* 1997–NMSC–006, ¶ 34, 122 N.M. 777, 932 P.2d 1; *Davis,* 497 N.W.2d at 921. Warrantless searches and seizures inside a home are presumptively unreasonable, subject only to a few specific, narrowly defined exceptions. *Flippo v. West Virginia,* 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (per curiam); *accord Mincey,* 437 U.S. at 390, 98 S.Ct. 2408; *Chavez v. Bd. of County Comm'rs,* 2001–NMCA–065, ¶ 21, 130 N.M. 753, 31 P.3d 1027.

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment

has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (alteration in original) (citation omitted); *accord State v. Snedeker,* 99 N.M. 286, 288, 657 P.2d 613, 615 (1982); *State v. Halpern,* 2001–NMCA–049, ¶ 14, 130 N.M. 694, 30 P.3d 383. New Mexico "consistently has expressed a strong preference for warrants" for all searches. *Gomez,* 1997–NMSC–006, ¶ 36, 122 N.M. 777, 932 P.2d 1; *Campos v. State,* 117 N.M. 155, 159, 870 P.2d 117, 121 (1994).

■■■ {24} The community caretaker exception recognizes that warrants, probable cause, and reasonable suspicion are not required when police are engaged in activities that are unrelated to crime-solving. *See Davis,* 497 N.W.2d at 919–20. However, police perform a variety of activities as community caretakers. *See Cady,* 413 U.S. at 441, 93 S.Ct. 2523; *People v. Ray,* 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 933–34 (1999); *Davis,* 497 N.W.2d at 919–20. Although a number of activities fall within the community caretaker exception, not every intrusion that results from one of these activities should be analyzed by the same standard. *Davis,* 497 N.W.2d at 920–21. When determining whether a warrantless search or seizure is reasonable on the basis of the community caretaker exception, we must measure " 'the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen.' " *Reynolds,* 119 N.M. at 388, 890 P.2d at 1320 (quoting *Ellenbecker,* 464 N.W.2d at 429).

■■■ {25} In balancing these interests, three distinct doctrines under the community caretaker exception have emerged: "1) the emergency aid doctrine, established in *Mincey;* 2) the automobile impoundment and inventory doctrine, first conceived in *Cady,* and later expanded upon in [*South Dakota v. Opperman,* 428 U.S. 364, 366, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ]; and, 3) the community caretaking doctrine, or public servant doctrine, established in *Cady* ...." *Laney v. State,* 117 S.W.3d 854, 860 (Tex.Crim.App.

2003). *See generally* Mary E. Naumann, Note, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J.Crim. L. 325, 330–31 (1999) (defining the community caretaker exception as "broad" and encompassing three versions, each requiring a different test). The common characteristic of these doctrines is that the intrusion upon privacy occurs while police are acting as community caretakers; their actions are motivated by "a desire to aid victims rather than investigate criminals." *State v. Mountford*, 171 Vt. 487, 769 A.2d 639, 645 (2000); *Laney*, 117 S.W.3d at 860–61. Although each of these doctrines has evolved in recognition of the important "community caretaker function" law enforcement officers provide, "it does not follow that all searches resulting from such activities should be judged by the same standard." *Davis*, 497 N.W.2d at 920. As the privacy expectation increases, the caretaker functions that justify an intrusion by police must be judged by a different standard. *Id.* at 921.

{26} [W]hile both [the community caretaker or public servant doctrine and the emergency aid doctrine] are based on an officer's reasonable belief in the need to act pursuant to his or her "community caretaking functions," the emergency doctrine is limited to the functions of protecting or preserving life or avoiding serious injury. *Laney*, 117 S.W.3d at 861. The emergency doctrine applies to, but is not limited to, warrantless intrusions into "personal residences." *Id.* The *Cady* community caretaker or public servant doctrine "deals primarily with warrantless searches and seizures of automobiles," *id.*, and " 'the officer might or might not believe there is a difficulty requiring his general assistance.' " *Id.* (quoting Naumann, *supra* at 333–34). Since there is a lesser privacy expectation in a vehicle on a public highway, an involuntary search or seizure there is judged by a lower standard of reasonableness: a specific and articulable concern for public safety requiring the officer's general assistance. *See Apodaca*, 118 N.M. at 626, 884 P.2d at 517; *Reynolds*, 117 N.M. at 25, 868 P.2d at 670. The emergency assistance doctrine, which may justify more intrusive searches of the home or person, must be assessed separately by a distinct test. 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.6(a) n. 5, at 390 (3d ed.1996); *see also Davis*, 497 N.W.2d at 920–21 (noting the need for standards specific to emergency entries). Since the privacy expectation is strongest in the home only a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge. *See Mincey*, 437 U.S. at 392, 98 S.Ct. 2408.[4]

{27} We conclude that police officers may enter a home without a warrant or consent under the emergency assistance doctrine. We recognize that the district court and the Court of Appeals based their decisions on the statement in *Nemeth* that "[t]he Fourth Amendment exception permitting warrantless entry into a home in the performance of community caretaking functions can be invoked only 'when the police are not engaged in crime-solving activities.' " 2001–NMCA–029, ¶ 38, 130 N.M. 261, 23 P.3d 936 (quoting *Davis*, 497 N.W.2d at 920). We do not construe *Nemeth* to mean that officers may never respond to an emergency when they are investigating a crime or attempting to arrest a suspect. *See Mincey*, 437 U.S. 385, 98 S.Ct. 2408 (addressing an emergency that arose during a drug raid). Rather, we conclude that the motivation for the entry

4. We note a distinction between the emergency assistance doctrine and the exception for exigent circumstances that also excuses a warrant. *Davis*, 497 N.W.2d at 920. Both require a compelling and immediate need for police to take swift action to prevent imminent danger to life or serious injury which exceeds an individual's privacy expectation in the home. *Compare Ray*, 88 Cal.Rptr.2d 1, 981 P.2d at 934, *with Gomez*, 1997–NMSC–006 ¶ 39, 122 N.M. 777, 932 P.2d 1. Nonetheless, they are separate doctrines. The exception for exigent circumstances applies when police are engaged in crime-solving activities, searching for evidence or suspects. *Davis*, 497 N.W.2d at 920. For entry into the home to be lawful, officers must have probable cause in addition to exigent circumstances. *State v. Aragon*, 1997–NMCA–087, ¶ 17, 123 N.M. 803, 945 P.2d 1021. The emergency assistance doctrine applies when police are acting not as crime-solvers, but rather acting in their capacity as community caretakers. *Ray*, 88 Cal.Rptr.2d 1, 981 P.2d at 933. Police may enter a home without probable cause to respond to an emergency situation. *Id.*

without a warrant or probable cause must be a strong sense of an emergency. *See Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 610 (stating police may not enter with an accompanying intent to arrest or gather evidence); *Walters,* 1997–NMCA–013, ¶ 25, 123 N.M. 88, 934 P.2d 282 (agreeing the initial encounter was as a caretaker rather than as an investigator).

{28} Our reading is consistent with the dual policies of encouraging police to perform caretaking functions and to obtain warrants to arrest or search. *Compare Gomez,* 1997–NMSC–006, ¶ 36, 122 N.M. 777, 932 P.2d 1 (stressing the importance of obtaining a warrant), *with Walters,* 1997–NMCA–013, ¶ 22, 123 N.M. 88, 934 P.2d 282 (refusing to discourage police officers from performing community caretaker stops). It is clear that individual privacy expectations must at times yield to a paramount interest in protecting and preserving life. *Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 611; *see also Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."). Police need not ignore an emergency simply because they are conducting a criminal investigation. We overrule *Nemeth* to the extent that it might be construed otherwise.

**D.**

{29} Having determined that police may enter a home without a warrant to respond to a strong sense of an emergency, we now address the standards that confine the emergency assistance doctrine. The Court in *Mincey* indicated that a warrantless entry and search of the home would pass constitutional muster under an objective test: whether police reasonably believed that a person within was in need of immediate aid to protect or preserve life or avoid serious injury, and the scope of the search was strictly limited to that purpose. 437 U.S. at 392–93, 98 S.Ct. 2408. Since then, some courts have adopted a purely objective test. *See, e.g., State v. Blades,* 225 Conn. 609, 626 A.2d 273, 280 & n. 7 (1993); *State v. Carlson,*

548 N.W.2d 138, 141–42 (Iowa 1996). Most courts, however, have accepted the requirements laid out in *Mitchell* or some variation of it. *Mountford,* 769 A.2d at 644; *see generally* LaFave, *supra* § 6.6(a), at 392–93. For the emergency assistance doctrine to apply under *Mitchell,* the state has the burden to establish three elements. First, "[t]he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." *Mitchell,* 383· N.Y.S.2d 246, 347 N.E.2d at 609. Second, "[t]he search must not be primarily motivated by intent to arrest and seize evidence." *Id.* Third, "[t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Id.* The test stated in *Nemeth* is similar to *Mitchell.* The officer must have "a reasonable and articulable belief, tested objectively, that a person is in need of immediate aid or assistance or protection from serious harm." *Nemeth,* 2001–NMCA–029, ¶ 37, 130 N.M. 261, 23 P.3d 936. The officer's actions must be in good faith; the entry must be made for a purpose consistent with community caretaking, rather than as a pretext for investigating criminal activity or searching for incriminating evidence. *Id.* ¶ 38. " '[T]he entry must be limited to the justification therefor, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance.' " 2001–NMCA–029 ¶ 38, 130 N.M. 261, 23 P.3d 936 (quoting *Davis,* 497 N.W.2d at 921). We address each part of this three-part inquiry and adopt the *Mitchell* test.

{30} The objective test is familiar to our search and seizure analysis. The constitutional requirement of reasonableness is tested objectively under the totality of the circumstances. *Vandenberg,* 2003–NMSC–030, ¶ 19, 134 N.M. 566, 81 P.3d 19. "This rule of law is best served by the application of certain objective criteria" based on the facts and circumstances of each case. *Attaway,* 117 N.M. at 149, 870 P.2d at 111. Our community caretaker cases also employ an objective test to determine whether a vehicle stop is based on a reasonable concern for

public safety. *Apodaca,* 118 N.M. at 626, 884 P.2d at 517.

{31} The objective standard for a warrantless and non-consensual entry into a home, however, requires a higher degree of urgency than the *Nemeth* decision may have conveyed. The emergency assistance doctrine applies specifically to warrantless intrusions into the home. The emergency assistance doctrine requires an emergency, a strong perception that action is required to protect against imminent danger to life or limb, an emergency that is sufficiently compelling to make a warrantless entry into the home objectively reasonable under the Fourth Amendment. *Compare Mincey,* 437 U.S. at 394, 98 S.Ct. 2408, *with Gomez,* 1997–NMSC–006, ¶ 39, 122 N.M. 777, 932 P.2d 1 ("[E]xigent circumstances [includes] 'an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property . . . .' ") (quoting *State v. Copeland,* 105 N.M. 27, 31, 727 P.2d 1342 (Ct.App.1986)).

{32} Some of the factors that the court should consider are the purpose and nature of the dispatch, the exigency of the situation based on the known facts, and "the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished." *State v. Ferguson,* 244 Wis.2d 17, 629 N.W.2d 788, 792 (Ct.App.2001) (quoted authority omitted); *cf. State v. Alexander,* 124 Md.App. 258, 721 A.2d 275, 279 (Ct.Spec.App.1998) (noting that reasonableness is a function of context). The fact that a different course of action would have been reasonable does not necessarily mean the officer's actions are unreasonable. *Gomez,* 1997–NMSC–006, ¶ 43, 122 N.M. 777, 932 P.2d 1. However, "their failure to take additional [or an alternative] action must be viewed in the totality of the circumstances to determine the ultimate reasonableness of their intrusion." *Ray,* 88 Cal.Rptr.2d 1, 981 P.2d at 938; *see, e.g., Davis,* 497 N.W.2d at 921–22 (suggesting that further investigation would have been necessary to justify the warrantless entry of the motel room when the only information officers had was a radio report with little detail that came from a questionable source). *But see, Alexander,*

721 A.2d at 287 (seeing no need for additional investigation when officers personally verified an anonymous tip by their own observations).

{33} The second part of the three-part *Mitchell* test is more controversial. Federal and state courts, including New Mexico, usually do not consider the subjective intent of an officer in a search and seizure analysis. *See Whren v. United States,* 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (stating that it has repeatedly held and asserted that an officer's motive does not invalidate objectively reasonable conduct under the Fourth Amendment); *United States v. Cervantes,* 219 F.3d 882, 889–90 (9th Cir. 2000); *Mountford,* 769 A.2d at 644; *Gomez,* 1997–NMSC–006, ¶ 40, 122 N.M. 777, 932 P.2d 1 (stating that an objective, not subjective, test determines whether exigent circumstances made a warrantless search of a vehicle lawful); *Attaway,* 117 N.M. at 148–49, 870 P.2d at 110–111 (indicating that objective criteria, rather than the subjective belief of an officer, determines whether noncompliance with the warrant requirement was lawful). While many courts have adopted the *Mitchell* test in its entirety, only a few have offered a rationale for permitting an inquiry into subjective motives.

{34} The primary rationale arises from the absence of a probable cause requirement in the emergency assistance doctrine. Some courts believe that subjective motives are still relevant when police do not have to show probable cause in order to ensure that such searches are not a pretext for criminal investigation. *Cervantes,* 219 F.3d at 890; *Mountford,* 769 A.2d at 645; *see* 1 LaFave, *supra* § 1.4 (commenting that pretext claims may still be viable when police action does not require probable cause). These courts cite *Whren* in support of this rationale. In declining to determine that an officer's ulterior motives would invalidate a lawful traffic stop, the Supreme Court distinguished between criminal investigations where probable cause and exigent circumstances are required to search from inventory and administrative searches where the probable cause requirement is excepted:

[O]nly an undiscerning reader would regard these [inventory and administrative search] cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred. In each case we were addressing the validity of a search conducted in the *absence* of probable cause. Our quoted statements simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, is not accorded to searches that are *not* made for those purposes.

*Whren,* 517 U.S. at 811–12, 116 S.Ct. 1769. Drawing from this statement, courts conclude that a pretext claim is viable when police justify a warrantless search under the community caretaker exception, as well as the emergency assistance doctrine. *Cervantes,* 219 F.3d at 889–90; *Mountford,* 769 A.2d at 644–45. A subjective test addresses the chief concern raised by a warrantless search purportedly justified by the community caretaker exception or emergency assistance doctrine: the possibility that the police will use the doctrine as a subterfuge or pretext when the real purpose of the search is to arrest a suspect or gather evidence without probable cause. *Ray,* 88 Cal.Rptr.2d 1, 981 P.2d at 937–38.

{35} Nevertheless, we recognize that emergency situations can occur during a criminal investigation. *See Davis,* 497 N.W.2d at 918; *Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 610. We also recognize that community caretaking encounters save lives and prevent serious injury; the police provide an important public service during such encounters. "Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life." *Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 611. The emergency assistance doctrine is not applicable, however, unless the entry is motivated by the perceived need to act immediately in order to save a life. *State v. Prober,* 98 Wis.2d 345, 297 N.W.2d 1, 10–11 (1980), *overruled on other grounds, State v. Weide,* 155 Wis.2d 537, 455 N.W.2d 899 (1990).

{36} While we do not believe it is realistic for officers to completely abandon their investigative function, we adopt the "primary motivation" standard set out in *Mitchell.* "[T]he protection of human life or property in imminent danger *must be the motivation* for the [initial decision to enter the home] rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding." *Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 610 (emphasis added). While the question of pretext or subterfuge is one factor that must be considered, it is not the end of the inquiry. The ultimate issue is whether officers had a reasonable concern that an individual's health would be endangered by a delay, and in fact were motivated by a need to address that concern. *Id.* The primary motivation must not be criminal investigation.

{37} "[C]onditioning the availability of the emergency doctrine exception on the searching officer's motivation is mandated by the doctrine's rationale that the preservation of human life is paramount to the right of privacy protected by the Fourth Amendment." *Prober,* 297 N.W.2d at 11. *But see Carlson,* 548 N.W.2d at 141 (rejecting a subjective test, because it is not satisfactorily subject to proof or disproof and sheds little light on the reasonableness inquiry). By adopting a primary motivation standard, we acknowledge the strong interest in protecting or preserving human life or avoiding serious injury exists even when police are investigating a crime. Nevertheless, we permit the trial court to examine motivation because, in the absence of a warrant, a neutral magistrate has not provided a preliminary review. "[The emergency assistance] exception is a narrow one, [and] courts must closely scrutinize the actions and motives of the police in order to determine whether the exception applies. This test is a means of subjecting police actions to that scrutiny." *Davis,* 497 N.W.2d at 918.

{38} The third part of the three-part test stated in *Mitchell* also is a common

aspect of an objective analysis in search and seizure and community caretaker cases. *See Apodaca,* 118 N.M. at 626, 884 P.2d at 517 ("The scope of any intrusion following the stop must be limited to those actions necessary to carry out the purposes of the stop. . . ."). Officers do not have "carte blanche to rummage for evidence if they believe a crime has been committed. There must be a direct relationship between the area to be searched and the emergency." *Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 610. The search must be " 'strictly circumscribed by the exigencies which justify its initiation.' " *Mincey,* 437 U.S. at 393, 98 S.Ct. 2408 (quoting *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Police " 'may do no more than is reasonably necessary to ascertain whether someone is in need of assistance . . . and to provide that assistance. . . .' " *Ray,* 88 Cal.Rptr.2d 1, 981 P.2d at 937 (quoting LaFave, *supra* 6.6(a), at 401). Once they are lawfully inside, officers may expand the scope of the intrusion, if probable cause or reasonable suspicion arises. *Apodaca,* 118 N.M. at 626, 884 P.2d at 517. Officers may also seize evidence of a crime that is in plain view or arrest a suspect if there is probable cause. *Mincey,* 437 U.S. at 393, 98 S.Ct. 2408; *Apodaca,* 118 N.M. at 626, 884 P.2d at 517. Otherwise, the scope of the search is limited by its purpose. Officers may not conduct a general exploratory search, unless otherwise warranted. *Blades,* 626 A.2d at 278.

{39} We adopt the *Mitchell* three-part inquiry as the relevant analysis in determining whether the emergency assistance doctrine applies to a warrantless, nonconsensual entry into the home. Police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property; the search must not be primarily motivated by an intent to arrest a suspect or to seize evidence. Although the police need not be totally unconcerned with the apprehension of suspects or the collection of evidence, the motivation for the intrusion must be a strong sense of an emergency; and there must be some reasonable basis, approximating probable cause, to associate the emergency with

the area or place to be searched. We now apply this analysis.

**E.**

{40} The facts known to the entering officers in this case are as follows. The deputies knew that the suspect in a stabbing incident might be headed to his home from the crime scene only a short distance away, and they were directed to his home to locate him. A second dispatcher told them that he might have sustained a wound to his head or his face. When they arrived, the door was slightly ajar, a light was on inside, it was a cold January night, and no one answered their knocks or calls. In summary, there was substantial evidence for the district court's finding that, "the Officers entered the Defendant's residence based on dispatch information that the Defendant *might* have been injured (possibly a head injury), their own observations that his door was slightly ajar in the wintertime, and there was no response to their knocks."

{41} These facts do not compel a conclusion that swift action was necessary to protect life or avoid serious injury. While these circumstances might suggest something is amiss, they do not add very much to the relevant inquiry. Many people purposely leave on a light even when they are away. An open door ought not be viewed as a general invitation to enter. *See Ray,* 88 Cal.Rptr.2d 1, 981 P.2d at 937. Moreover, unlike the facts in several of the cases relied on by the State, the residence entered was not the scene of a reported incident of violence, burglary, or other crime; the incident reported had occurred at another location. *See, e.g., Mincey,* 437 U.S. 385, 98 S.Ct. 2408 (searching home for additional victims after deadly confrontation between officers and occupant); *Alexander,* 124 Md.App. 258, 721 A.2d 275 (responding to breaking and entering); *State v. Johnson,* 104 Wash.App. 409, 16 P.3d 680 (2001) (searching home for victims in response to domestic violence in progress); *State v. Menz,* 75 Wash.App. 351, 880 P.2d 48 (1994) (investigating domestic violence in progress); *Ferguson,* 244 Wis.2d 17, 629 N.W.2d 788 (responding to 911 call regarding a fight). A reasonable explanation

was that Defendant, as a fugitive, had fled or was inside hiding.

{42} To justify the warrantless intrusion into a private residence under the emergency assistance doctrine, officers must have credible and specific information that a victim is very likely to be located at a particular place and in need of immediate aid to avoid great bodily harm or death. In *Mitchell,* for example, the police were called to a hotel to investigate a possible kidnaping. 383 N.Y.S.2d 246, 347 N.E.2d at 610. Hotel residents searched but were unable to locate the hotel maid who had been missing for several hours. *Id.* 383 N.Y.S.2d 246, 347 N.E.2d at 608. Under the facts and circumstances known to the officers, it was highly probable that she was somewhere in the hotel and that she had met some grave misfortune, either due to an illness, an accident, or a crime: the maid was last seen leaving an elevator on the sixth floor where she had been assigned to clean rooms, and her partially eaten lunch and street clothes were observed on the sixth floor. *Id.* 383 N.Y.S.2d 246, 347 N.E.2d at 610. After searching the entire hotel, alleyways, and adjoining restaurant, the police conducted a room-by-room search, eventually locating her body inside a closet in the defendant's room on the sixth floor. *Id.* 383 N.Y.S.2d 246, 347 N.E.2d at 609–10. The court concluded that the officers had valid reasons, grounded in empirical facts, to believe that an emergency existed. *Id.* 383 N.Y.S.2d 246, 347 N.E.2d at 610.

{43} Unlike *Mitchell,* the officers in this case had only generalized, nonspecific information that Defendant might be inside and that he might have sustained a head or face injury. They did not know the nature or extent of the injury. They did not even know whether he was injured. There was no evidence that Defendant was at home. In light of what little the deputies actually knew, it would have been more reasonable to conduct some minimal investigation to corroborate their suspicions, rather than immediately entering the home. To better evaluate the situation, the officers easily could have contacted deputies at the scene only a short distance away. They also could have walked around the home, looked in windows,

or contacted the occupants of the home on the same property. *Cf. Nemeth,* 2001–NMCA–029, ¶¶ 5–6, 130 N.M. 261, 23 P.3d 936.

{44} Neither do we think it too much of a burden for the police to corroborate generalized information before they risk intruding into a home. In the absence of an obvious life-threatening emergency, corroboration will either confirm the need for immediate emergency action, or dispel it altogether. Accordingly, considering all the circumstances known and otherwise knowable to the officers in this case, we conclude that the emergency assistance doctrine does not support their entrance into Defendant's home without a warrant.

{45} We further conclude that even if the deputies had a good-faith generalized concern for Defendant's welfare, there was substantial evidence to support the trial court's finding that, "the facts within the entering officers' knowledge were not sufficient to elevate their primary role to that of community caretaking." Both deputies testified that they went to the home to locate a suspect. Although they thought the circumstances that they observed at the home were odd, at least one officer testified that he entered Defendant's home to look for the suspect *and* to check on his welfare. They lacked sufficient information to compel their actions. "[T]he protection of human life or property in imminent danger must be the motivation for the search rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding." *Mitchell,* 383 N.Y.S.2d 246, 347 N.E.2d at 610. For these reasons, we conclude that the officers in substantial part were engaged in crime-solving activities rather than responding to an emergency.

**III.**

{46} We hold that a police officer or officers may enter a home without a warrant or consent pursuant to the emergency assistance doctrine as articulated in *Mitchell.*

Applying *Mitchell,* we conclude that the information available to the officers did not justify the warrantless intrusion into Defendant's home. We affirm the Court of Appeals and the trial court. The decision to suppress the evidence was appropriate under *Mitchell.*

{47} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.