162 P.3d 173 (2007)
2007-NMCA-066
STATE of New Mexico, Plaintiff-Appellant,
v.
Kathy TRUDELLE and Michael Trudelle, Defendants-Appellees.
No. 25,476.
Court of Appeals of New Mexico.
April 4, 2007.
Certiorari Granted May 24, 2007.
*175 Gary K. King, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, NM for Appellant.
Gorence & Oliveros, P.C., Robert J. Gorence, Albuquerque, NM for Appellees.
Certiorari Granted, No. 30,370, May 24, 2007.

*176 OPINION
BUSTAMANTE, Judge.
{1} This case requires us to determine whether the district court erred in suppressing evidence obtained pursuant to a warrant based in part on unlawfully acquired information. More specifically, we address whether the issuing judge preserved the warrant's validity by making a handwritten note that he found probable cause for the warrant to issue even without considering the tainted information. We follow our decision in State v. Wagoner, 2001-NMCA-014, 130 N.M. 274, 24 P.3d 306 [hereinafter Wagoner II], and conclude that the warrant was invalid. Accordingly, we affirm.
BACKGROUND
{2} On September 9, 2003, Officer Tank Guenther was dispatched to the residence of Kathy and Michael Trudelle (Defendants) in Albuquerque, New Mexico due to an anonymous tip that a heavy chemical odor was emanating from the residence, possibly due to the existence of a methamphetamine lab there. Officer Guenther met with another officer near the residence. As the officers walked up the driveway toward the house, Officer Guenther began to smell a chemical odor that he recognized from previous experience as an odor associated with methamphetamine production. The smell was strong enough to give Officer Guenther a headache; he became concerned for his safety as well as the safety of anyone who might have been in the house or in the surrounding area. The officers made contact with Mr. Trudelle at the front door and asked him to step out onto the front porch so that they could speak with him. Officer Guenther asked to enter the house and yard to investigate the source of the chemical odor and Mr. Trudelle refused to give his consent. Officer Guenther noticed that Mr. Trudelle's fingers were "yellowed" and "scorched," which was consistent with Officer Guenther's other encounters with persons who had been cooking methamphetamine.
{3} The officers asked Mr. Trudelle if anyone else was in the house. Mr. Trudelle told them that his wife, Kathy, was inside, as were their dog and cats. Officer Guenther asked for Mrs. Trudelle, who came out and spoke with him on the porch while the other officer continued speaking to Mr. Trudelle. Mrs. Trudelle refused her consent for the officers to search the house and yard. Unsure of how to proceed, Officer Guenther called Sergeant Torgrimson and requested that he come out to the residence. While Sergeant Torgrimson was en route, the officers allowed Mrs. Trudelle back into the house unaccompanied to use the restroom. Sergeant Torgrimson arrived on the scene in less than one-half hour.
{4} Officer Guenther explained to Sergeant Torgrimson that, given the strong chemical odor coming from the property, he suspected the presence of a meth lab, although he had no idea whether an active cook was taking place. Sergeant Torgrimson decided that they would secure the house, make sure everyone was outside, and call in narcotics officers. Although they did not have Defendants' consent to enter, Officer Guenther and Sergeant Torgrimson accompanied Mr. Trudelle into the house and searched the entire building for people and animals. While inside the house, Sergeant Torgrimson looked out the kitchen window and saw a detached garage with a door that was halfway open. Mr. Trudelle retrieved his dog and came back out onto the porch with the police officers once they determined no one else was in the house.
{5} At or around this time, the officers discovered that Mrs. Trudelle had an outstanding arrest warrant. The officers placed her under arrest, searched her, and discovered a syringe filled with heroin. Sergeant Torgrimson told Mr. Trudelle that he was free to leave. Mr. Trudelle took his dog and drove off in a van that was parked in the driveway. Sergeant Torgrimson then called for a narcotics detective to come and determine whether a search warrant would be necessary.
{6} Following Mr. Trudelle's departure, Sergeant Torgrimson decided that he and Officer Guenther should check the backyard to make sure that no one was still on the property. As the officers were checking the yard, they noticed that the door to the garage that Sergeant Torgrimson had previously *177 observed half open was now almost completely shut. Sergeant Torgrimson became concerned that Mr. Trudelle had come around the back of the property and entered the garage, or that perhaps someone else had done so. Officer Guenther drew his weapon and went to inspect the doorway to the garage. He opened the door and was immediately hit with a chemical odor that was even stronger than what he had experienced earlier. He noticed a fan blowing out toward the doorway and did not want to enter because the smell was "overpowering." He looked inside the building and did not see anyone, although he did notice a hot plate, beakers and other items resembling a methamphetamine lab.
{7} The officers retreated from the backyard, secured the premises and waited for the narcotics detective to arrive. Detective Eugene Etheredge arrived a short while later. The officers explained what they had observed to Detective Etheredge. Based on their description of the fan, the hot plate, and the chemical odor in the garage, Detective Etheredge decided to see if there was an active cook taking place that might pose a threat of explosion. Detective Etheredge looked into the garage, saw the items that had been described to him, and determined that there was no risk of explosion at that time. He retreated from the garage and prepared a search warrant.
{8} Detective Etheredge stated in his affidavit for the search warrant that the officers who originally arrived at the scene had secured the residence. However, Detective Etheredge did not explain that the officers had entered the home with Mr. Trudelle and that, while inside the house, Sergeant Torgrimson observed the half-open door to the garage. Instead, Detective Etheredge asserted the following:
While securing the back of the residence to insure no subjects were placed in harms [sic] way[,] Officer Guenther observed the door to the garage area in the closed position. Officer Guenther stated he had observed the door in the open position upon his arrival to the residence.
Detective Etheredge then described his and Officer Guenther's observations from looking into the garage, including the specific items that Detective Etheredge determined were part of a methamphetamine lab. District Judge James Blackmer signed the warrant, although he highlighted the portion of the warrant describing Officer Guenther's and Detective Etheredge's observations of the inside of the garage and included the following handwritten notation above the signature line:
Although this [highlighted] information is very likely lawfully acquired, even without considering this information, the court finds probable cause to issue (and will issue) a search warrant for 1818 Ridgecrest, S.E.
{9} On February 5, 2004, a grand jury indicted Defendants on charges of trafficking methamphetamine, contrary to NMSA 1978, § 30-31-20(A)(1) (1990) (amended 2006); conspiracy, contrary to NMSA 1978, § 30-28-2 (1979) and Section 30-31-20(A)(1); and possession of drug paraphernalia, contrary to NMSA 1978, § 30-31-25.1(A) (2001). Defendants jointly filed a motion to suppress the evidence obtained as a result of the search warrant. Defendants asserted that the officers' warrantless entries on their property took place without Defendants' consent, without justification due to exigent circumstances, and were thus in violation of Defendants' state and federal constitutional rights. Defendants further claimed that, when the officers arrived, there was no evidence that a meth lab was actively producing methamphetamine so as to threaten the immediate area. Thus, Defendants argued, nothing prevented the officers from obtaining a warrant before searching their property.
{10} District Judge Richard Knowles held a suppression hearing that spanned three days: September 28, 2004, October 26, 2004, and November 23, 2004. Judge Knowles determined at the September 28, 2004, hearing that, if the warrant contained unlawfully acquired information, the warrant would be invalid despite Judge Blackmer's notation. Judge Knowles later ruled that Officer Guenther and Sergeant Torgrimson were lawfully inside Defendants' home when Sergeant Torgrimson observed the half-open garage door from the kitchen window. Specifically, *178 Judge Knowles found that, although the aroma of a meth lab alone did not amount to an exigent circumstance, the officers had probable cause to suspect the existence of a meth lab and were therefore entitled to enter the residence to secure the premises. However, Judge Knowles determined that the officers could not bolster the affidavit for the search warrant by including additional evidence observed while securing the premises. Judge Knowles therefore granted Defendants' motion to suppress the evidence obtained pursuant to the search warrant.
{11} The State brings the present appeal and asks us to reverse on either of two grounds: (1) the district court erred in ruling that the officers could not include in the search warrant affidavit any evidence obtained from plain view observations made during the protective sweep of Defendants' home; or (2) even if the search warrant affidavit included unlawfully acquired information, Judge Blackmer cured any defect by noting that he found probable cause to issue the warrant apart from the tainted information. Conversely, Defendants urge us to affirm, arguing that: (1) the district court correctly found that no exigent circumstances existed to justify the officers' entry into their home; (2) the district court erred in determining that the officers had the authority to conduct a protective sweep of the residence in the first place; (3) without the illegally obtained observations from the officers' first entry into Defendants' home, no exigent circumstances could exist with regard to the subsequent entries into the garage; and (4) the warrant was tainted and therefore invalid under Article II, Section 10 of the New Mexico Constitution.
{12} We begin by addressing Defendants' contention that the officers lacked the authority to conduct the initial protective sweep of Defendants' home. Because we agree with Defendants that the protective sweep was illegaland therefore the information obtained as a result of the sweep was improperly included in the affidavit for the search warrantwe do not reach the question of whether the officers could have properly included the information had they conducted a lawful protective sweep. We conclude by considering whether Judge Blackmer's notation prevented the illegally acquired information from invalidating the warrant.
DISCUSSION
{13} When reviewing a district court's ruling on a motion to suppress evidence, we must determine "whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." State v. Lopez, 2005-NMSC-018, ¶ 9, 138 N.M. 9, 116 P.3d 80 (internal quotation marks and citation omitted). We review the district court's factual findings for substantial evidence. Id. Our review of the district court's application of the law to the facts is de novo. State v. Attaway, 117 N.M. 141, 145-46, 870 P.2d 103, 107-08 (1994).
A. Constitutionality of the Initial Police Entry
{14} The Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons . . . and effects" by prohibiting "unreasonable searches and seizures." U.S. Const. amends. IV and XIV; State v. Robbs, 2006-NMCA-061, ¶ 11, 139 N.M. 569, 136 P.3d 570. "The legality of a search . . . ultimately turns on the question of reasonableness." State v. Ryon, 2005-NMSC-005, ¶ 11, 137 N.M. 174, 108 P.3d 1032. A warrantless search is presumptively unreasonable, "unless it falls within an exception to the warrant requirement." State v. Corneau, 109 N.M. 81, 89, 781 P.2d 1159, 1167 (Ct.App.1989).
{15} The State asserts that the officers' first entry into Defendants' home was a permissible protective sweep, or fell under the community caretaker exception to the warrant requirement. Although the State argued in its docketing statement that the district court erred in ruling that no exigent circumstances justified the entry, the State failed to address that argument explicitly in its brief in chief. We generally will not consider arguments that do not appear in the appellate briefs. State v. Aragon, 109 N.M. 632, 634, 788 P.2d 932, 934 (Ct.App.1990) *179 ("All issues raised in the docketing statement but not argued in the briefs have been abandoned."). However, as we discuss more fully below, the State makes an implicit exigency argument in its brief using the rubric of a protective sweep theory. We therefore address the exigency question following our discussion of the protective sweep. We then consider whether the community caretaking exception applies in this case.
1. Protective Sweep
a. The District Court's Ruling
{16} We begin by noting that the district court applied an incorrect legal standard in ruling that the officers were entitled to enter Defendants' home based solely on probable cause. In support of its ruling, the district court cited Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), as standing for the proposition that, once officers have probable cause to suspect criminal activity inside of a residence, the officers can go in and "secure the premises," though they cannot include plain view observations from the entry in an affidavit for a search warrant. This reading of Segura is inaccurate. Segura involved an illegal search that resulted in the discovery of evidence that the United States Supreme Court held admissible under the independent source doctrine. Id. at 814, 104 S.Ct. 3380. The Court expressly stated that, due to the applicability of the independent source doctrine, the legality of the initial entry in that case was "wholly irrelevant," id., and that the Court had "no reason to question the [Second Circuit's] holding that that search was illegal." Id. at 798, 104 S.Ct. 3380. Although the Court acknowledged the illegality of the search, the Court nonetheless considered whether the entry was a constitutionally permissible seizure of the defendants' possessory interests in their apartment. Id. at 798-99, 104 S.Ct. 3380.
{17} The law enforcement agents in Segura arrested the defendants at their apartment building and secured their apartment from within for a period of 19 hours while waiting for a previously requested search warrant to issue. Id. at 800-01, 812-13, 104 S.Ct. 3380. The defendants asserted that the agents' entry and continuing presence in their residence constituted an impermissible seizure of their property under the Fourth Amendment. Id. at 805, 104 S.Ct. 3380. The Court noted that the defendants were advancing a seizure argument as a clever attempt to prevent the independent source doctrine from preserving the admissibility of the illegally discovered evidence. See id. at 806, 104 S.Ct. 3380 (explaining that, "[i]f all the contents of the apartment were `seized' at the time of the illegal entry and securing, presumably the evidence now challenged would be suppressible as primary evidence obtained as a direct result of that entry"). The Court further pointed out that "[d]ifferent interests are implicated by a seizure than by a search . . . [a] seizure affects only the person's possessory interests; a search affects a person's privacy interests." Id. (citations omitted). Nevertheless, the Court reaffirmed that, "absent exigent circumstances, a warrantless search . . . is illegal." Id. at 810, 104 S.Ct. 3380 (emphasis added) (citation omitted).
{18} In addressing the defendants' seizure argument, the Court held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." Id. (Emphasis added). In support of its holding, the Court stated that "a seizure affects only possessory interests, not privacy interests. Therefore, the heightened protection we afford privacy interests is simply not implicated where a seizure of premises, not a search, is at issue." Id. The Court further noted that the agents did not exploit their presence in the defendants' apartment and that the warrant that eventually issued was based on information "wholly unconnected with the entry and was known to the agents well before the . . . entry." Id. at 812-14, 104 S.Ct. 3380. The Court therefore concluded that the legality of the entry was irrelevant and that the independent source doctrine precluded suppression of the evidence seized pursuant to the warrant. Id. at 814, 104 S.Ct. 3380.
{19} The case at bar is both factually and legally distinguishable from Segura. First, unlike the agents in Segura, the officers in *180 the present case entered Defendants' home before deciding to obtain a search warrant and did not remain there while waiting for a search warrant to issue. Thus, even if the entry constituted a seizurean argument no party advances hereit would not fall within the Segura rule because the officers were not in the process of obtaining a search warrant. See id. at 810, 104 S.Ct. 3380 ("[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure" (emphasis added)). Second, and more importantly, the officers in the present case exploited their presence in Defendants' home by conducting searches of the detached garage based on Sergeant Torgrimson's observations from the kitchen window during the initial entry. The evidence discovered from those searches made its way into the affidavit for the search warrant that eventually issued. Therefore, the legality of the initial entry in the present case is of paramount importance with respect to the admissibility of the evidence ultimately seized pursuant to the warrant. In contrast, the officers in Segura were in the process of obtaining a warrant prior to entering the apartment, and it was upon this "independent source" that the Court relied in holding that the evidence discovered pursuant to the warrant was admissible. Id. at 812-14, 104 S.Ct. 3380.
{20} We conclude that the district court's reliance on Segura was misplaced; the holding in that case does not authorize law enforcement officers to enter a suspect's home solely on the basis of probable cause. Although the Court in Segura found that the entry in that case was a permissible seizure under the Fourth Amendment, the Court did not rule that the evidence the agents ultimately obtained was admissible due to the validity of the seizurei.e., that the evidence was the fruit of a permissible "entry"but instead held that the evidence was admissible by application of the independent source doctrine. We therefore hold that the district court erred as a matter of law in ruling that the officers were entitled to enter Defendants' home on the basis of probable cause alone. We now examine whether the officers' warrantless entry was nonetheless permissible as a protective sweep.
b. The Law of Protective Sweeps
{21} The Supreme Court of the United States has defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "[A] protective sweep may be undertaken if the searching officers possess a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept har-bored an individual posing a danger to the officer or others." State v. Valdez, 111 N.M. 438, 440, 806 P.2d 578, 580 (Ct.App.1990) (internal quotation marks and citation omitted). However, "[a] protective sweep is only allowed incident to a lawful arrest." Id. (emphasis added).
{22} The State half-heartedly asserts that the arrest of Mrs. Trudelle "could arguably support a protective sweep of the premises." This argument fails for three reasons. First, the record appears to show that the officers conducted the protective sweep prior to arresting Mrs. Trudelle. We have previously held that a protective sweep is "uncalled for" where the sweep takes place before the police decide to place a suspect under arrest. Id. Second, the fact that the officers left Defendants unrestrained and allowed Mrs. Trudelle to re-enter the house unaccompanied suggests that the officers did not fear for their safety, at least with respect to Defendants or others who may have remained inside of the house. See id. at 440-41, 806 P.2d at 580-81 (finding that officers did not reasonably fear danger where suspect was left unrestrained and was allowed to re-enter house). Finally, the officers arrested Mrs. Trudelle pursuant to an unrelated, outstanding warrant that the officers happened to discover during or following the protective sweep. Therefore, the arrest of Mrs. Trudelle bears no relation to the protective sweep and cannot be used to justify it.
*181 {23} The State next urges us to follow the reasoning of several cases from other jurisdictions that uphold protective sweeps in the absence of an arrest. However, the officers in these cases either: (1) did not conduct a protective sweep at all, (2) responded to specific, articulable facts regarding possible threats to their safety from other suspects, or (3) entered to prevent destruction of evidence only where exigent circumstances were present. See, e.g., Illinois v. McArthur, 531 U.S. 326, 331-32, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (holding that police did not violate defendant's Fourth Amendment rights by preventing him from entering his home unaccompanied given exigent circumstances); United States v. Taylor, 248 F.3d 506, 512-14 (6th Cir.2001) (holding that protective sweep was justified where officers obtained consent from defendant's roommate to enter defendant's apartment, heard shuffling noises indicating the presence of multiple persons, had information that defendant was a drug and weapons dealer suspected of numerous murders, and observed defendant's roommate behaving nervously); United States v. Patrick, 959 F.2d 991, 996-97 (D.C.Cir.1992) (holding that, where police already had consent to be in an apartment, "they were authorized to conduct a protective sweep based on their reasonable belief that one of [the apartment's] inhabitants was trafficking in narcotics") abrogated on other grounds by Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); United States v. Daoust, 916 F.2d 757, 759 (1st Cir.1990) (finding that protective sweep was permissible where police had reasonable fear for their safety while executing a warrant to seize a gun inside defendant's house); Nelson v. State, 271 Ga.App. 658, 610 S.E.2d 627, 629-30 (2005) (holding that officers properly conducted protective sweep after observing movement inside the premises and apprehending suspects who were fleeing the premises); State v. Fees, 140 Idaho 81, 90 P.3d 306, 311-12 (2004) (holding that protective sweep was permissible where officers knew that a warrant had already issued and had reason to believe that the suspect's wife would destroy evidence upon learning of his arrest); State v. Straub, 749 N.E.2d 593, 599-601 (Ind.Ct.App.2001) (holding that officer could enter defendant's apartment based on reasonable fear that the passage of time while seeking a warrant would diminish the strength of the evidence of his alcohol consumption after he fled a traffic stop, ignored the officer's commands to stop fleeing, and hid in his apartment). None of these cases are on point.
{24} To the contrary, once the officers in the present case were speaking with Defendants on the front porch, they did not observe anything indicating the presence of others inside the house who may have posed a threat or destroyed evidence. Nor did the officers have any information that Defendants had weapons or were prone to violence. The officers did not feel compelled to arrest Defendants prior to conducting the sweep, and they allowed Mrs. Trudelle to re-enter the house unaccompanied to use the restroom. Put simply, the officers did not articulate any facts indicating a threat to their safety or to the preservation of evidence from Defendants or other persons inside the house that would justify entering the premises to conduct a protective sweep.
{25} Nevertheless, the State argues that the evidence suggesting the existence of a meth lab on the property, combined with Mrs. Trudelle's arrest and Mr. Trudelle's desire to retrieve his dog from the house, justified the protective sweep. This argument is without merit. First, as we have previously stated, Mrs. Trudelle's arrest was of no consequence with regard to the protective sweep. Second, the record shows that Mr. Trudelle decided to retrieve his dog only after the officers told him that they were going to conduct the sweep with or without his consent. Even if we were to assume that Mr. Trudelle's entry constituted some type of exigency, that exigency would have been of the officers' own making and thus cannot be used to justify the sweep. See State v. Wagoner, 1998-NMCA-124, ¶ 13, 126 N.M. 9, 966 P.2d 176 [hereinafter Wagoner I] ("[T]he exigency should not be one improperly created by law enforcement officers."), overruled on other grounds by Wagoner II, 2001-NMCA-014, ¶ 40, 130 N.M. 274, 24 P.3d 306.
*182 {26} The only remaining evidence in the record that could support the officers' entry into Defendants' home is the evidence suggesting the existence of a meth lab on the property, i.e., the chemical odor and Mr. Trudelle's yellowed and scorched hands. Although the State cites a series of cases involving meth labs and protective sweeps, none of these cases hold that, absent exigent circumstances, evidence indicating the presence of a meth lab alone justifies a protective sweep. See, e.g., United States v. Gerry, 845 F.2d 34, 36-37 (1st Cir.1988) (holding that officers were justified in conducting sweep after arresting defendant in his home pursuant to a warrant and reasonably believing others were on the premises); VanWinkle v. State, 764 N.E.2d 258, 266-67 (Ind.Ct.App. 2002) (holding that officers properly conducted protective sweep after arresting defendant and learning that others were inside defendant's house, where officers believed the defendant was making methamphetamine); State v. Rowland, 73 S.W.3d 818, 823 (Mo.Ct.App.2002) (holding that strong smell of ether emanating from hotel room was exigent circumstance "[g]iven the room's proximity to other rooms, the volatility of the chemical, and the possibility of unconscious persons being located in the room").
{27} We conclude that the officers' entry into Defendants' home was impermissible under the State's protective sweep theory. Nevertheless, the State's argument, though couched in terms of the protective sweep "exception," can be read to implicitly assert that exigent circumstances justified the entry. Because the State raised the issue in its docketing statement and appears to make an exigency argument in its brief in chief using the language of protective sweeps, we now turn to the question of whether substantial evidence supports the district court's ruling in this regard.
2. Exigent Circumstances
{28} "A warrantless entry into a residence under the exigent circumstances rule requires probable cause plus exigent circumstances." Valdez, 111 N.M. at 441, 806 P.2d at 581. "Exigent circumstances are defined as those situations where immediate action is necessary to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." Corneau, 109 N.M. at 89, 781 P.2d at 1167 (internal quotation marks and citation omitted). The standard for determining exigency is an objective one; the question is "whether in a given situation a prudent, cautious, and trained officer, based on facts known, could reasonably conclude swift action was necessary." Id.; see also State v. Calloway, 111 N.M. 47, 50, 801 P.2d 117, 120 (Ct.App.1990) ("[O]bjective conditions rather than an officer's subjective intentions determine whether exigent circumstances exist."). Whether the district court correctly determined that an exigency existed is a mixed question of fact and law that we review de novo. State v. Attaway, 117 N.M. 141, 144-46, 870 P.2d 103, 106-08 (1994).
{29} At least two New Mexico cases have addressed the question of whether exigent circumstances supported warrantless entries where officers suspected the existence of a drug manufacturing facility. See State v. Johnson, 2004-NMCA-064, 135 N.M. 615, 92 P.3d 61, rev'd in part on other grounds, 2006-NMSC-049, 140 N.M. 653, 146 P.3d 298; Calloway, 111 N.M. 47, 801 P.2d 117. We acknowledged in Johnson that, "[b]ecause a methamphetamine lab poses a danger of explosion, other jurisdictions have found that where officers know there is a lab in operation, that knowledge may create exigency." 2004-NMCA-064, ¶ 11, 135 N.M. 615, 92 P.3d 61. However, we concluded that, even if a working methamphetamine lab were a type of exigent circumstance, officers would still be required to show particularized information supporting an objectively reasonable belief that a working methamphetamine lab is in operation. Id. ¶¶ 11-12; see also Attaway, 117 N.M. at 152, 870 P.2d at 114 (holding that, under the New Mexico Constitution, a determination of exigency requires something more than general knowledge). But see Lopez, 2005-NMSC-018, ¶¶ 18-20, 138 N.M. 9, 116 P.3d 80 (clarifying Attaway by holding that courts must consider the totality of the circumstances in each case). In Calloway, we held that the hazardous chemicals used to manufacture methamphetamine *183 created an exigent circumstance justifying an officer's entry into the defendant's home because the home had caught fire and an arson investigator had already become aware of the chemicals during his lawful entry into the home. 111 N.M. at 50, 801 P.2d at 120.
{30} In the present case, the district court ruled that no exigent circumstances justified the officers' initial entry into Defendants' home. As noted above, the officers did not articulate factsother than those relating to the possible existence of a meth labthat could have formed a reasonable basis for the officers to enter the house. With regard to the evidence suggesting the existence of a meth lab, the district court stated that it was "not prepared to say that meth labs are per se exigency . . . I think that there's got to be a more specific showing than mere aroma." We agree.
{31} First, although Officer Guenther recognized the chemical smell on Defendants' property as a smell associated with methamphetamine production, he testified that he could not tell whether an active cook was taking place. Second, Officer Guenther testified that he was not concerned about immediate danger to officer safety as he was speaking to Defendants on their front porch. Instead, Officer Guenther claimed that he was concerned for the safety of others who might have remained in the house, although he decided to wait up to thirty minutes for Sergeant Torgrimson to arrive before entering the house and allowed Mrs. Trudelle to re-enter the house unaccompanied. Officer Guenther also admitted that the chemical smell was not as strong on the front porch as it was in Defendants' driveway. Finally, Sergeant Torgrimson made no additional observations that would have added to the officers' determination of exigency, but instead "relied on what [the other officers] told me at that point."
{32} Given the above-mentioned facts, we cannot say that the district court's ruling is unsupported by substantial evidence. We recognize as a general matter that methamphetamine labs can be dangerous because they contain chemicals that may be explosive under certain conditions. In the present case, however, neither the officers' observations nor their conduct indicated that immediate action was necessary to prevent "imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." Corneau, 109 N.M. at 89, 781 P.2d at 1167 (internal quotation marks and citation omitted). While it is true that the officers had probable cause to suspect the existence of a methamphetamine laba fact that Defendants concedethis information alone does not rise to the level of an exigent circumstance. Holding otherwise would create a per se exigency rule whenever officers have probable cause to suspect the existence of a methamphetamine lab. We decline to establish such a rule and instead reaffirm our holding in Johnson that officers must show "particularized information, . . . [supporting] an objectively reasonable belief of exigency." 2004-NMCA-064, ¶¶ 11-12, 135 N.M. 615, 92 P.3d 61 (emphasis added); see, e.g., United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir.2003) (upholding district court's finding of exigent circumstances where officers observed defendant purchasing materials to manufacture methamphetamine, followed defendant to his house, detected the smell of cooking methamphetamine after watching the residence for an hour, and reasonably concluded that there was an immediate threat to the public from a potential explosion). We now turn to the State's argument that the officers' entry into Defendants' home can be justified under the community caretaking exception to the warrant requirement.
3. Community Caretaking
{33} As a preliminary matter, we note that the State failed to preserve this issue for appeal because it neither raised the issue in the district court, nor in its docketing statement. Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"). Nevertheless, an appellate court may, in its discretion, consider questions involving "general public interest." Rule 12-216(B)(1). As mentioned previously, methamphetamine labs have the potential to *184 explode under certain circumstances. This risk of explosion may require police to act swiftly to prevent serious injury or death. We therefore believe that there exists a question of general public interest whether, and under what circumstances, police, in their roles as community caretakers, may enter a residence without a warrant when they suspect the residence contains a methamphetamine lab. Accordingly, we exercise our discretion to consider this question in the present case.
{34} The United States Supreme Court first recognized the community caretaker exception in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The Court found that a warrantless search could be justified by an "immediate and constitutionally reasonable . . . concern for the . . . general public." Id. at 447, 93 S.Ct. 2523. In determining the reasonableness of a warrantless search or seizure under the community caretaker exception, "we must measure the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen." Ryon, 2005-NMSC-005, ¶ 24, 137 N.M. 174, 108 P.3d 1032 (internal quotation marks and citation omitted). When police are acting as community caretakers, "their actions are motivated by a desire to aid victims rather than investigate criminals." Id. ¶ 25 (internal quotation marks and citation omitted).
{35} Our Supreme Court has stated that, when police conduct a warrantless search of a home in their community caretaking capacity, the search must be analyzed under the emergency assistance branch of the community caretaker exception. Id. ¶ 22. The emergency assistance doctrine "is limited to the functions of protecting or preserving life or avoiding serious injury." Id. ¶ 26. "Since the privacy expectation is strongest in the home[,] only a genuine emergency will justify entering and searching a home without a warrant and without consent or knowledge." Id. "The emergency assistance exception is a narrow one, and courts must closely scrutinize the actions and motives of the police in order to determine whether the exception applies." Id. ¶ 37 (alteration omitted) (internal quotation marks and citation omitted).
{36} The Court in Ryon adopted the three-part test set forth in People v. Mitchell, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976) abrogated by Brigham City, Utah v. Stuart, ___ U.S. ___, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), for applying the emergency assistance doctrine:
First, the police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. Second, the search must not be primarily motivated by intent to arrest and seize evidence. Third, there must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.
Ryon, 2005-NMSC-005, ¶ 29, 137 N.M. 174, 108 P.3d 1032 (alteration omitted) (internal quotation marks and citations omitted). The Court further held that, "[t]o justify the warrantless intrusion into a private residence under the emergency assistance doctrine, officers must have credible and specific information that a victim is very likely to be located at a particular place and in need of immediate aid to avoid great bodily harm or death." Id. ¶ 42.
{37} In the present case, the State's argument fails to satisfy the first prong of the Mitchell test. Just as the officers could not articulate facts showing the presence of exigent circumstances at Defendants' home, neither can they show reasonable grounds to believe there was an emergency requiring immediate assistance for the protection of life or property. See Ryon, 2005-NMSC-005, ¶ 26 n. 4, 137 N.M. 174, 108 P.3d 1032 (explaining that both the emergency assistance doctrine and the exigent circumstances exception "require a compelling and immediate need for police to take swift action to prevent imminent danger to life or serious injury which exceeds an individual's privacy expectation in the home"). Although they expressed a concern about safety with regard to meth labs in general, the officers did not have any credible and specific information about possible victims inside of Defendants' *185 home. Absent such specific information, the officers were not entitled to enter as community caretakers.
{38} The State's argument that the community caretaker exception justified the officers' warrantless entry is without merit. Because the officers were not entitled to conduct the initial search of Defendants' home under any of the State's theories, we next consider whether the district court correctly ruled that the search warrant was fatally tainted due to the inclusion of unlawfully acquired information.
B. Validity of the Warrant and Applicability of the Independent Source Doctrine
{39} As the foregoing discussion demonstrates, the exclusionary rule may compel suppression of evidence obtained either directly or indirectly from an unlawful search or seizure. Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, the exclusionary rule may not apply if police obtain evidence through means genuinely independent of the illegal government conduct. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), overruled on other grounds by United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). This exception to the exclusionary rule, known as the independent source doctrine, is based on a policy that, "while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied." Murray v. United States, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).
{40} We have previously held that, under the New Mexico Constitution, "a search conducted pursuant to a warrant based partially on tainted information gathered during a prior illegal search is not an independent source of the evidence seized and therefore [the evidence] must be suppressed." Wagoner II, 2001-NMCA-014, ¶ 40, 130 N.M. 274, 24 P.3d 306. Unlike its federal counterpart, "[t]he exclusionary rule under Article II, Section 10 of the State Constitution is a constitutional right belonging to the individual." Id. ¶¶ 19, 29. New Mexico courts will suppress unlawfully obtained evidence "to effectuate in the pending case the constitutional right of the accused to be free from unreasonable search and seizure." Id. ¶ 29 (internal quotation marks and citation omitted). "The purpose of the state exclusionary rule is accomplished by doing no more than return the parties to where they stood before the right was violated." Id. ¶ 30 (internal quotation marks and citation omitted). However, application of the independent source doctrine where evidence has been seized pursuant to a tainted warrant may "put the police in a better . . . position." Id. ¶¶ 30, 33.
{41} The facts leading to the unlawful search in Wagoner are strikingly similar to those in the present case. In Wagoner, officers went to the defendant's home to investigate possible drug dealing based on a tip by an informant. 2001-NMCA-014, ¶ 2, 130 N.M. 274, 24 P.3d 306. One of the officers smelled burning marijuana as they approached the house. Id. The defendant answered the door and denied the officers his consent to search the residence. Id. The officers sought advice from their sergeant, who instructed them to conduct a sweep of the house to prevent the destruction of evidence. Id. One of the officers observed incriminating evidence during the sweep and mentioned these observations in an application for a warrant. Id. A magistrate judge issued the warrant and the officers seized the evidence and additional marijuana while conducting a second search pursuant to the warrant. Id.
{42} The defendant successfully moved to suppress the evidence seized pursuant to the warrant, arguing that exigent circumstances did not justify the officers' first entry into his home. Id. ¶ 3. The State appealed and we affirmed the district court's ruling that the warrantless entry was not justified by exigent circumstances. Id.; see Wagoner I, 1998-NMCA-124, ¶ 22, 126 N.M. 9, 966 P.2d 176. However, we remanded the case for the district court to consider whether the inevitable discovery doctrine precluded application of the exclusionary rule. Wagoner II, 2001-NMCA-014, ¶ 3, 130 N.M. 274, 24 P.3d 306. *186 On remand, the officers testified that they intended to get a warrant prior to entering the defendant's home. Id. ¶ 5. The issuing magistrate also testified that she would have issued the warrant even if the application for the warrant had not included the information from the illegal entry. Id. The district court denied the defendant's motion to suppress, concluding that the officers would have obtained a warrant even if they had not illegally entered the defendant's house. Id. ¶ 6. The defendant entered a conditional plea and appealed the denial of his motion to suppress. Id.
{43} In Wagoner II, we determined that the inevitable discovery doctrine did not apply to the facts of that case and that the independent source doctrine was the proper rule for analyzing the admissibility of the evidence. Id. ¶¶ 15-16. "[W]hen there is no objective evidence of either a standard procedure or an independent investigation, we believe that the New Mexico Constitution requires us to carefully scrutinize the facts to determine whether a warrant is truly independent of prior illegal conduct by police." Id. ¶ 32. Analyzing the independence of the warrant, we noted that:
In this case and cases like it, application of the independent source exception would allow a non-compliant officer to take a shortcut and circumvent the warrant requirement merely to confirm suspicions and then bolster the affidavit for a later warrant, knowing that the search pursuant to the later warrant will stand so long as the magistrate agrees that the warrant would have issued without the illegally obtained information. This is bad policy and runs contrary to the stated purpose of the exclusionary rule under the State Constitution.
Id. ¶ 33. We concluded that suppression was necessary to effectuate the defendant's rights under the New Mexico Constitution. Id. ¶ 34. In support of our holding, we reasoned that "[t]he independent source doctrine could be the exception that swallowed the rule if it were to be used to admit evidence that was only hypothetically available through an independent source." Id. ¶ 37. We further noted that a subjective inquiry into the mind of the issuing magistrate would run counter to "our strong preference for objective standards for measuring police conduct with respect to constitutional rights." Id. ¶¶ 38-39.
{44} In the present case, the State does not challenge the rule set forth in Wagoner II. Instead, the State argues that Judge Blackmer's notation on the search warranti.e., that he would issue the warrant even without considering the possibly tainted informationcured the warrant of any defect. In support of this argument, the State asserts that Judge Blackmer's notation on the warrant addresses the concern we expressed in Wagoner II regarding the difficulty of speculating on appeal whether an issuing judge would have found probable cause without considering the improperly obtained information. See id. ¶ 39 ("[W]e are troubled by the evidentiary inquiry into the mind of the magistrate apparently required by this Court's prior opinion."). The State misreads our holding in Wagoner II.
{45} Our concern in Wagoner II about "plac[ing] a magistrate judge in an awkward position of speculating about what might have been done under hypothetical circumstances" was not limited to situations in which the magistrate testifies on remand after an appeal. Id. To the contrary, any time a judge is confronted with an affidavit for a warrant that contains tainted information, the judge is forced to hypothesize about whether and how a warrant would issue had the police not acted illegally. This is precisely what Judge Blackmer did in the present case; he noted on the warrant that he found probable cause for the warrant to issue even without considering the possibly tainted information. While it is true that this unorthodox procedure leaves us with little doubt that Judge Blackmer would have issued the warrant had the affidavit not contained tainted information, we explicitly rejected the use of such hypothetical information to save a tainted warrant in Wagoner II. Id.
{46} Our main concern in Wagoner II was that allowing the independent source doctrine to preserve a tainted warrant would encourage police to use the doctrine to circumvent the warrant requirement altogether. Id. ¶ 33. Thus, our holding in Wagoner II is *187 geared toward police conduct, not magistrate conduct. As we stated in Wagoner II,
[w]e believe that Article II, Section 10 of the New Mexico Constitution prohibits us from retroactively and hypothetically correcting the errors of the police at the expense of a defendant's right to be free from an unreasonable search and seizure. Where the [S]tate has transgressed the constitutional rights of a person accused of a crime, we will not sanction that conduct by turning [a blind eye]. . . . [S]uppression is necessary to effectuate Defendant's constitutional rights.
Id. ¶ 34 (internal quotation marks and citation omitted). More specifically, we intended that our holding would:
"(1) . . . provide[] a bright line rule for law enforcement officers and for courts reviewing police conduct, and (2) . . . properly effectuate[] an individual's right to be free from an unreasonable search and seizure and the corresponding right not to have evidence gained by exploitation of a constitutional violation used against the individual in court."
Id. ¶ 40.
{47} We reaffirm our holding in Wagoner II that suppression is necessary where a warrant contains tainted information. Id. ¶ 34. Accordingly, we conclude that, under Article II, Section 10 of the New Mexico Constitution, a judge may not validate illegal police conduct by issuing a warrant that contains tainted information, even if the judge makes a notation that the warrant would have issued without the tainted information. Therefore, the district court did not err in granting Defendants' motion to suppress.
CONCLUSION
{48} For the foregoing reasons, we affirm.
{49} IT IS SO ORDERED.
WE CONCUR: JONATHAN B. SUTIN, Chief Judge, and A. JOSEPH ALARID, Judge.